Frank MANCUSO, Ellen Mancuso, individually and on behalf of their children, Deanna and Theresa Mancuso and F. Mancuso Boat Yard, Inc. d/b/a Echo Bay Marine, Plaintiffs,

v.

CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Defendant.

No. 93 Civ. 0001 (WCC).

United States District Court, S.D. New York.

Nov. 3, 1995.

John A. Tartaglia, White Plains, New York (John A. Tartaglia, of counsel), for plaintiffs.

Charles E. McTiernan, Jr., New York City (Richard J. Giglio, Thomas J. Puppa, of counsel), for defendant.

WILLIAM C. CONNER, Senior District Judge.

This action is a citizen suit brought under the Clean Water Act, *see* 33 U.S.C. § 1365, to which plaintiffs have added pendent claims under New York state law for personal injuries and property damage. On December 12, 1994, Judge Vincent L. Broderick granted the defendant's motion for partial summary judgment dismissing the state law claims for property damage as barred by the applicable statute of limitations. Pursuant to Local Rule 3(j) and Fed.R.Civ.P. 60(b)(2), plaintiffs have moved for reargument of that motion and for relief from the judgment. For the reasons set forth below, although we grant the motion for reargument in part, summary judgment dismissing plaintiffs' state law claims for property damage is granted. The

motion for relief from the judgment is denied.

## BACKGROUND

In October 1987, plaintiff Frank Mancuso purchased Echo Bay Marina from Robert Kohlasch. The marina is adjacent to a substation owned and formerly operated by Consolidated Edison ("ConEd"). ConEd ceased to use the substation in 1981 and has since been engaged, intermittently, in dismantling it and cleaning up the site. The marina is also adjacent to a storm drain that carries runoff from the New York State Thruway and to an oil storage facility and pipeline terminal owned and operated by Shoreline Oil Company, Inc. ("Shoreline").

In August 1992, Mancuso filed a claim against Kohlasch in New York State Supreme Court seeking rescission of the sale of the marina. Mancuso asserted that Kohlasch had fraudulently concealed, until after the sale was complete, that the storm drain existed, that the channel was too shallow to navigate at low tide, and that the marina was contaminated by PCBs. In an affidavit submitted to the state court in connection with that suit, Mancuso explained that Kohlasch continued to work at the marina for approximately six months after the sale. At some point during that time, Kohlasch told Mancuso that "the water at the marina was full of PCBs from the Con Edison plant on the other side of the channel." Kohlasch also informed Mancuso that when he dredged the marina in 1984, he submitted mud samples from another portion of the harbor to the New York Department of Environmental Conservation ("NYDEC") for testing. Kohlasch recommended that Mancuso do the same if he ever dredged the marina because submitting samples of the contaminated mud from the marina would result in special disposal costs. *See* Affidavit of Frank Mancuso, dated August 18, 1992, at ¶ 6, attached as Exhibit F to Certification of Richard J. Giglio, dated October 11, 1994; *see also* Affidavit of Frank Mancuso, dated April 25, 1995, at ¶ 7.

Plaintiffs allege that on July 2 and July 29, 1992, Mancuso's counsel mailed to ConEd notices of PCB contamination in Echo Bay and at the marina, pursuant to 33 U.S.C. § 1365(b)(1)(A). On January 4, 1993, plaintiffs [1] filed suit against ConEd alleging past and continuing discharges of PCBs and other toxic chemicals from the substation site. In addition to alleging violations of the Clean Water Act, the suit included pendent claims under New York state law for gross negligence, nuisance, strict liability under the New York Navigation Law, trespass and battery. Plaintiffs requested compensatory and punitive damages, as well as injunctive relief against future discharges.

On June 11, 1993, ConEd moved for summary judgment dismissing the entire action because plaintiffs' notices failed to specify, in sufficient detail, an ongoing violation of the Clean Water Act. Judge Broderick denied that motion because the issues it raised were too intertwined with the merits of the action to be decided at that stage. On October 11, 1994, ConEd moved again for summary judgment, arguing that plaintiffs' state law claims for property damage were barred by the applicable statute of limitations. Judge Broderick granted that motion in a brief opinion dated December 12, 1994. Judge Broderick held that Mancuso had actual knowledge by some time in early 1988 of property damage to the marina caused by PCB contamination from the ConEd substation. Because Mancuso failed to bring suit until January 1993, his state law property damage claims were barred by N.Y.Civ.Prac.L. & R. § 214–c(2), which prescribes a three-year limitation period for any injury caused by the latent effects of exposure to toxic substances.[2] Plaintiffs

---

1. Plaintiffs are Frank Mancuso, his wife Ellen Mancuso, their daughters Deanna and Theresa Mancuso, and F. Mancuso Boat Yard, Inc., d/b/a Echo Bay Marine, a company wholly owned by Frank Mancuso.

2. Section 214–c(2) provides that:
   [T]he three year period within which an action to recover damages for personal injury or injury to property caused by the latent effects of exposure to any substance ... must be commenced shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier.

filed a Notice of Appeal from Judge Broderick's ruling, but withdrew their appeal as premature on February 23, 1995. Instead, they requested reargument before the district court.

On March 21, 1995, this case was reassigned to us. At a conference held shortly thereafter, we granted permission for plaintiffs to seek reargument of ConEd's motion for partial summary judgment[3] and to move pursuant to Fed.R.Civ.P. 60(b)(2) for relief from the judgment on the ground of newly discovered evidence. We have carefully considered the voluminous papers submitted to us, and we now address each of plaintiffs' requests in turn.

## DISCUSSION

### I. Motion for Reargument

■ The standard for granting a motion for reargument is strict to prevent wasteful reconsideration of arguments on issues already fully considered by the court. *See Farkas v. Ellis*, 783 F.Supp. 830, 832 (S.D.N.Y.), *aff'd*, 979 F.2d 845 (2d Cir.1992). The moving party must demonstrate that the court overlooked controlling decisions or factual matters that might have materially influenced the earlier decision. *See Violette v. Armonk Assocs.*, 823 F.Supp. 224, 226 (S.D.N.Y.1993); *Farkas*, 783 F.Supp. at 833.

Plaintiffs argue that Judge Broderick overlooked (1) allegations made by plaintiffs that indicate the existence of an issue of fact concerning Mancuso's knowledge of the presence of PCBs at the marina, (2) case law that requires a much higher level of knowledge than Mancuso possessed in order to bar claims on limitation grounds, (3) the existence of issues of fact regarding the applicability of equitable estoppel to this case, and (4) allegations of property damage caused by

pollutants other than PCBs. Plaintiffs also argue that Judge Broderick misapplied controlling law by relying on the wrong limitation provision. They contend that he should have applied N.Y.Civ.Prac.L. & R. § 214–c(4), which extends the limitation period for plaintiffs who discover the injury to their persons or property before they are able to discover the cause of the injury. Plaintiffs assert that their claims would not be time-barred under this provision.

### A. Claims for Property Damage from PCBs

In evaluating plaintiffs' arguments concerning their claims of property damage from PCB contamination, we must be mindful of the circumstances under which summary judgment is appropriate. Fed.R.Civ.P. 56(c) provides that the court shall grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." The Supreme Court has held that there is no genuine issue of fact for trial "unless there is sufficient evidence favoring the nonmoving party for a [reasonable] jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The court must draw all justifiable inferences in favor of the nonmoving party, *see id.*, at 255, 106 S.Ct. at 2513, but summary judgment may be granted if the evidence presented by the nonmoving party is not significantly probative. *See id.*, at 249–50, 106 S.Ct. at 2510–11.

#### 1. Knowledge

■ Under this standard, it is apparent that no genuine dispute exists over the fact that Mancuso had actual knowledge of PCB contamination at the marina following his conversation with Kohlasch.[4] Neither

---

**3.** Defendant argues that we should deny plaintiffs' motion because it is untimely under Local Rule 3(j), which requires that motions for reargument be filed within ten days of the issuance of the ruling for which the movant seeks reconsideration. At conference, however, we gave plaintiffs permission to file their motion. We therefore deem this motion timely filed.

**4.** Because this motion is addressed solely to the limitation issue, we will assume for the moment

that Mancuso's property is contaminated with the toxic substances that he alleges have been discharged from the substation. We note, however, that ConEd has denied that any toxic substances have been discharged from its property since the substation site clean-up was completed in 1987. ConEd has also denied that the substation was the source of any contaminants found on plaintiffs' property. Our opinion should in no

ConEd nor Mancuso disputes that Kohlasch made the statements in question or that Mancuso heard them.[5] Instead, plaintiffs attempt to demonstrate the existence of an issue of fact by contending that Mancuso did not actually know of the PCB contamination because he did not believe Kohlasch's statements at the time they were made. Plaintiffs argue that Judge Broderick's ruling overlooked an affidavit that Mancuso submitted in this action in which he testified that he did not believe what Kohlasch told him because Kohlasch was an alcoholic and because Kohlasch immersed himself in the waters of Echo Bay while helping Mancuso repair the marina's bulkhead. *See* April 1995 Mancuso Affidavit, ¶ 7.

It is well-settled in this Circuit, however, that "a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir. 1991); *see Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987); *Miller v. International Telephone & Telegraph Corp.,* 755 F.2d 20, 24 (2d Cir.), *cert. denied,* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985); *Perma Research & Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969). Admittedly, in each of those cases, both the pre-motion testimony and the affidavits submitted in opposition to summary judgment were given in the same case. Here, by contrast, Mancuso first described Kohlasch's comments in an affidavit submitted in the state court action and now seeks to contradict, or at least drastically recharacterize, that testimony in this case. We see no reason, however, why this distinction should lead to a different result.

The rationale behind the Second Circuit's approach to this issue is to prevent the nonmoving party from defeating summary judgment merely by creating spurious disputes

regarding the credibility of the nonmovant's previous factual assertions. That is, however, precisely what plaintiffs seek to accomplish here. Mancuso has advanced no other explanation for asserting in his 1992 affidavit that, based on Kohlasch's statements to him, he was aware that "PCBs and other hazardous waste pose a substantial and imminent health hazard to my family and myself because we are forced to spend so much time on the premises [of the marina] ...," *see* 1992 Mancuso Affidavit, at ¶¶ 6, 14, while later asserting in an affidavit submitted in this action that because Kohlasch had dredged the marina and because he went into the water there, Mancuso "did not take his statement to mean that the Marina, after the dredging, was still contaminated." *See* April 1995 Mancuso Affidavit, at ¶ 7. Hence, Mancuso has not demonstrated that a genuine issue of fact exists regarding his understanding of Kohlasch's statements that would require resolution by a jury.

Plaintiffs also argue that an issue of fact exists regarding whether Mancuso had actual knowledge of the PCB contamination following his conversation with Kohlasch because Kohlasch later testified—at a deposition taken during discovery in this case—that he had never discussed pollution problems with Mancuso. *See* Deposition Transcript of Robert Kohlasch, undated, at 42, attached as Exhibit 2 to Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, dated November 18, 1994. Plaintiffs ask us to infer from Kohlasch's denial, made years later, that in 1988 Mancuso believed Kohlasch's statements to be mere rumors of PCB contamination at the marina. Such an inference is simply not justifiable when considered in conjunction with Mancuso's own 1992 affidavit, which states clearly that Mancuso learned of the PCB contamination from Kohlasch by some time in early 1988.[6] Plaintiffs' contention is therefore not

---

way be construed as a ruling on the merits of these contentions.

5. Indeed, if Mancuso were to dispute the existence of Kohlasch's statements, he would be admitting to perjuring himself in his previous affidavit.

6. Furthermore, Judge Broderick's ruling noted that deposition testimony and plaintiffs' answers to interrogatories also contain undisputed indications that Mancuso had actual knowledge of the PCB contamination at the marina following his conversation with Kohlasch. *See, e.g.,* Mancuso's Handwritten Answers to Interrogatories, attached as Exhibit V to Giglio Certification ("Bob

significantly probative of the existence of a genuine issue of fact.

Plaintiffs next argue that Judge Broderick's ruling also overlooked case law that set a high standard for finding knowledge under § 214–c and that Kohlasch's statements are clearly insufficient to satisfy that standard. Plaintiffs argue that *Jensen v. General Electric Co.,* 82 N.Y.2d 77, 603 N.Y.S.2d 420, 623 N.E.2d 547 (1993), established that property owners do not have actual knowledge of the injury to their property until they have received actual notification and detailed scientific information from the defendant. Unfortunately for plaintiffs, *Jensen* did not so hold.

In *Jensen,* the trial court dismissed plaintiff Jensen's property damage claims as barred by § 214–c(2) because he did not file suit within three years of discovering the injury to his property. On appeal, in its recital of the facts of the case, the Court of Appeals noted that discovery of the injury occurred when plaintiff received actual notice and detailed information from defendant General Electric, which distributed those materials under a consent decree it had entered into with NYDEC to clean up a nearby waste site. *See Jensen,* 603 N.Y.S.2d at 421, 623 N.E.2d at 548. The Court then addressed the question of whether the common law doctrine of continuing trespass and nuisance, under which a cause of action for damages accrues each day while the trespass or nuisance continues, remained applicable to actions for damages from the latent effects of toxic substances following the enactment of § 214–c. Far from "examin[ing] the standard by which ordinary people, such as the Plaintiffs[,] are to be judged when imputing knowledge," *see* Plaintiffs' Memorandum in Support of Reargument, at 13, the Court said

nothing about the relationship between the plaintiff's level of sophistication and the amount of information required to constitute discovery of injury.

As we stated above, it is apparent from Mancuso's own testimony that he was told by the prior owner of the marina that the property was contaminated by PCBs. The prior owner had reason to know, as he explained to Mancuso, because he had substituted mud samples from elsewhere in the Bay to avoid the costs of disposing of contaminated soil. This is clearly sufficient to constitute discovery of the injury to plaintiffs' property.[7] Accordingly, Judge Broderick's finding that Mancuso had actual knowledge of PCB contamination at the marina by some time in early 1988 is sound.

■ Plaintiffs devote a substantial portion of their motion papers to arguing that Judge Broderick overlooked evidence demonstrating that Mancuso did not have constructive knowledge of the damage to his property until 1991. Plaintiffs assert that before that time, state and local authorities informed them that the ConEd site had been cleaned up and that there was no indication of any PCB discharge. According to plaintiffs, their suspicions of PCB contamination were not confirmed until 1991, when a potential buyer refused to purchase the marina because officials at City Hall in New Rochelle told him that the marina was contaminated with PCBs. *See* Reply Affidavit of Frank Mancuso, dated May 18, 1995, at ¶ 11. Plaintiffs contend that during the period when the responsible state and local authorities told them that there was no indication of PCB contamination on their property, Mancuso cannot reasonably be held to have had knowledge of the contamination.

Kohlasch. [F]ormer owner. Spoke many times of PCB's at site, and how to test mud for dredging so it passes test."); Deposition Transcript of Steven Billerback, dated Nov. 16, 1993, at 14–15, attached as Exhibit R to Giglio Certification (Mancuso's nephew, who worked at marina from late 1987 to spring 1988, testified Mancuso told him to stay out of water because of PCBs).

7. Plaintiffs argue that they are entitled on summary judgment to the benefit of a reasonable inference that the marina was no longer contaminated because Kohlasch had removed all of the

contaminated soil when he dredged the marina in 1984. We do not find such an inference justifiable. In the same conversation in which Kohlasch informed Mancuso that there were PCBs in the sediment in 1984, he advised Mancuso to follow his example and to submit mud samples from another part of the harbor if Mancuso ever dredged the harbor. *See* 1992 Mancuso Affidavit, at ¶ 6. The only reasonable inference that may be drawn from this testimony is that the 1984 dredging did not remove all of the PCBs from the marina.

Plaintiffs' argument is unpersuasive. Under § 214–c, the limitations period begins to run on "the date of discovery of the injury" or on "the date when through the exercise of reasonable diligence such injury should have been discovered." Either actual or constructive knowledge of the injury will therefore suffice to start the limitation period. In this case, Mancuso had actual knowledge that PCBs were present on his property. Whether he had constructive knowledge is irrelevant.

### 2. Equitable Estoppel

■■■ Plaintiffs also devote a considerable number of pages to attempting to establish that Judge Broderick overlooked the existence of issues of fact regarding whether ConEd should be equitably estopped from raising the affirmative defense of the expiration of the limitation period. Under New York law, equitable estoppel is available if by fraud, misrepresentation or deception the plaintiff was induced to refrain from filing a timely action. *See Simcuski v. Saeli,* 44 N.Y.2d 442, 406 N.Y.S.2d 259, 262, 377 N.E.2d 713, 715 (1978). Typically, equitable estoppel is applicable to situations in which the defendant either fraudulently conceals the existence of the cause of action from the plaintiff or makes positive misrepresentations to the plaintiff that cause plaintiff to abstain from suit until after the limitation period has run. *See Barrett v. Hoffman,* 521 F.Supp. 307, 320 (S.D.N.Y.1981), *rev'd on other grounds,* 689 F.2d 324, 333 (2d Cir. 1982), *cert. denied,* 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983). The plaintiff must have relied on the defendant's actions, and that reliance must have been justifiable. *See Simcuski,* 406 N.Y.S.2d at 262, 377 N.E.2d at 715.

■■■ In this case, plaintiffs have not alleged that ConEd made any affirmative misstatements directly to them regarding discharge into Echo Bay or into the marina. Instead, plaintiffs argue that ConEd fraudulently concealed from the public and from governmental agencies that the substation site continued to discharge PCBs and other toxic substances. Plaintiffs assert that state and local officials then gave them erroneous assurances that their property was not contaminated. Plaintiffs contend that they relied on that information in refraining from bringing suit.[8]

The New York Court of Appeals has held that claims of equitable estoppel should not be favored when raised by a plaintiff who has knowledge of the basic facts necessary to bring the action within the limitation period. *See Augstein v. Levey,* 3 A.D.2d 595, 162 N.Y.S.2d 269, 273 (1957), *aff'd,* 4 N.Y.2d 791, 173 N.Y.S.2d 27, 149 N.E.2d 528 (1958); *Babigian v. Ass'n of the Bar of the City of New York,* 744 F.Supp. 47, 52 (S.D.N.Y.) (citing *Augstein* ), *aff'd,* 912 F.2d 462 (2d Cir.), *cert. denied,* 498 U.S. 1012, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990). New York appellate courts have further held that equitable estoppel is unavailable to a plaintiff who possesses " 'timely knowledge' sufficient to place him or her under a duty to make inquiry and ascertain all the relevant facts prior to the expiration of the applicable Statute of Limitations." *Gleason v. Spota,* 194 A.D.2d 764, 599 N.Y.S.2d 297, 299 (1993); *McIvor v. Di Benedetto,* 121 A.D.2d 519, 503 N.Y.S.2d 836, 837 (1986); *Ramsay v. Mary Imogene Bassett Hosp.,* 113 A.D.2d 149, 495 N.Y.S.2d 282, 285 (1985), *appeal dismissed,* 67 N.Y.2d 608, 502 N.Y.S.2d 1026, 494 N.E.2d 113 (1986); *see also Renz v. Beeman,* 589 F.2d 735, 751 (2d Cir.1978), *cert. denied,* 444 U.S. 834, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979).

In general, the issue of whether equitable estoppel is available is a question of fact, but summary judgment is appropriate in the "rare case where the admissions of the plain-

---

**8.** We note that under New York law, equitable estoppel is unavailable to plaintiffs because they failed to plead it. *See Florio v. Cook,* 48 N.Y.2d 792, 423 N.Y.S.2d 917, 918, 399 N.E.2d 947 (1979); *Anderson Co. v. Devine,* 202 A.D.2d 382, 608 N.Y.S.2d 514, 515 (1994). Given the liberal approach to pleading embodied in Fed.R.Civ.P. 15(a), if we were to reject plaintiffs' equitable estoppel argument on this basis, we would none-theless grant leave to amend the complaint to encompass plaintiffs' factual assertions on this issue. We would then be faced with addressing the merits of plaintiffs' argument. This course of action is needlessly formalistic and time-consuming. Accordingly, we will address the merits of plaintiffs' equitable estoppel argument as if that claim had been properly plead.

tiff ... negate, as a matter of law, an essential element of equitable estoppel, i.e., justifiable reliance...." *McIvor*, 503 N.Y.S.2d at 840 (on summary judgment in medical malpractice action, equitable estoppel not available where plaintiff's deposition testimony revealed her timely knowledge that doctor's representations about decedent's condition were false). Furthermore, courts often seem to determine as a matter of law whether a plaintiff has satisfied the due diligence requirement. *See, e.g., Renz*, 589 F.2d at 751–52 (appeal from grant of motion to dismiss) (no equitable estoppel available because plaintiff did not fulfill due diligence requirement); *Babigian*, 744 F.Supp. at 52 (motion to dismiss) (same); *Augstein*, 162 N.Y.S.2d at 273 (appeal from ruling on motion to dismiss) (same); *McIvor*, 503 N.Y.S.2d at 839 (summary judgment motion) (same). In this case, Mancuso admitted in his deposition receiving timely information from the prior property owner regarding PCB contamination at the marina. That information placed plaintiffs under a duty to exercise due diligence in attempting to ascertain the relevant facts related to their potential claims. Plaintiffs have failed to satisfy that obligation.

In May 1992, plaintiffs engaged two environmental firms to test their property for contamination. Plaintiffs apparently relied on the results of those tests in deciding to file this action. *See* May 1995 Mancuso Affidavit, at ¶ 11. Plaintiffs have advanced two explanations for their failure to conduct those tests within the limitation period. Neither is satisfactory. Plaintiffs first contend that they failed to do any testing on their proper-

ty during the limitation period because they requested information regarding PCB contamination from state and local agencies and relied on their representations that the ConEd substation had been cleaned up and was not discharging PCBs. Elsewhere in plaintiffs' motion papers, however, Mancuso swears that during the limitation period:

> the only environmental problem that I and my family were focused on [was discharge] emanating from the Thruway drain. Our complaints to governmental officials in these years were about the drain had [sic] nothing to do with the Con Edison site or any pollution emanating from that site, although we were always curious about what work and cleanup was [sic] being done there.

April 1995 Mancuso Affidavit, at ¶ 8. Mancuso states that he and other members of his family called countless environmental officials to complain about the debris and pollutants emanating from the storm drain, demonstrating his diligence in pursuing information about the harmful effects of runoff from the storm drain. *See id.* By contrast, he asserts vehemently that he did not pursue inquiries about PCBs, merely stating instead that "[a]ny time that the Con Edison plant was discussed with governmental officials between 1988–1992 all that I and my family was [sic] told was that the PCB's at the substation had been cleaned up...." [9] *Id.* Curiosity about what is going on next door and nonspecific references to passing conversations do not demonstrate fulfillment of the due diligence required of plaintiff.

**9.** We acknowledge that in making our finding that Mancuso had actual knowledge of PCB contamination following his conversation with Kohlasch, we refused to consider Mancuso's denial of actual knowledge, made in the same April 1995 affidavit on which we now rely. Mancuso's characterization of his inquiries is accordingly somewhat suspect.

In fact, ConEd argues forcefully that discovery materials and deposition testimony demonstrate that during the limitation period Mancuso did in fact discuss PCBs with state and local officials, prospective buyers, employees, customers and at least one environmental consultant. Furthermore, Mancuso himself swore, in an affidavit submitted in opposition to ConEd's motion for partial summary judgment, that prior to May 1992 he had made inquiries at numerous state

and local agencies seeking information about any PCB contamination on his property. *See* Affidavit of Frank Mancuso, dated November 18, 1994, at ¶ 3.

Nevertheless, we decline to find that the existence of that testimony, which casts some doubt on the veracity of Mancuso's April 1995 description of his inquiries, creates an issue of fact as to whether plaintiffs are entitled to equitable estoppel. We are not inclined to exercise our equitable power for the benefit of a plaintiff whose sworn testimony has shifted dramatically to suit plaintiffs' evolving litigation strategy. Instead, for the purposes of deciding the equitable estoppel issue, we will accept at face value Mancuso's April 1995 sworn statement regarding plaintiffs' inquiries into contamination at the marina.

Second, Mancuso contends that he did not know until after the limitation period expired that he could perform tests on his own property. Instead he asserts that he believed that only the appropriate environmental agency was responsible for testing. Mancuso has testified, however, that Terry Baker, a representative from a non-governmental environmental group who visited the property in the summer of 1988 at the request of Mancuso's uncle, informed him that tests could be done to ascertain whether the marina was contaminated but that Baker's group did not have the resources to do the testing itself. *See* Deposition Transcript of Frank Mancuso, at 1008, attached as Exhibit I to Giglio Certification. Despite receiving this information, Mancuso did not pursue private testing until May 1992. This course of action does not satisfy the due diligence requirement.

Hence, we find that Mancuso has made admissions that reveal timely knowledge of PCB contamination at the marina and that plaintiffs have failed to satisfy their duty to attempt to ascertain all the relevant facts related to their claims. Under these circumstances, we find that this case is one of the rare cases where the appropriate course is to grant summary judgment denying plaintiffs the benefit of equitable estoppel.

### 3. Section 214–c(4)

Finally, plaintiffs argue that Judge Broderick applied the wrong statute of limitations to plaintiffs' claims for property damage from PCB contamination. They contend that the applicable limitation period is not the three years prescribed by § 214–c(2), but instead the longer period mandated by § 214–c(4). That section provides:

> [W]here the discovery of the cause of the injury is alleged to have occurred less than five years after discovery of the injury ..., an action may be commenced ... within one year of the discovery of the cause of the injury; provided, however, if any such action is commenced [more than three years after the discovery of the injury], plaintiff ... shall be required to allege and prove that technical, scientific or medical knowledge and information sufficient to as-

certain the cause of his injury had not been discovered, identified or determined prior to the expiration of the [three-year] period....

Plaintiffs contend that even if Mancuso had actual knowledge of the PCB contamination by early 1988, he did not have sufficient knowledge of the cause of the injury to his property to bring an action against ConEd until after he tested his property in 1992. *See* Plaintiffs' Memorandum in Support of Reargument, at 55, 57. Plaintiffs contend, therefore, that their property damage claims are timely filed because they discovered the cause of the injury to the marina less than five years after discovering the injury, and brought suit on December 31, 1992, within one year of the discovery of the cause.

We see at least two problems with plaintiffs' argument on this point. First, plaintiffs raise this contention for the first time on this motion for reargument. It is well-settled in the Southern District that on a motion for reargument, the district court may rely on Local Rule 3(j) to prohibit a party from advancing new facts, issues or arguments not previously presented to the court. *See United States v. Certain Funds on Deposit in Scudder Tax Free Inv. Account,* 998 F.2d 129, 132 (2d Cir.1993); *In Re Integrated Resources Real Estate Ltd. Partnerships Securities Litigation,* 850 F.Supp. 1105, 1151 (S.D.N.Y.1993). In the papers that plaintiffs filed in opposition to ConEd's motion for partial summary judgment, they did not even mention § 214–c(4), much less argue that it should apply in this case. Therefore, it cannot be considered a matter that Judge Broderick "overlooked" in deciding to grant summary judgment dismissing plaintiffs' state law property damage claims. *See Stein Heurtey, S.A. v. Bricmont & Assocs., Inc.,* 1992 WL 54362, at *2 (S.D.N.Y. Mar. 4, 1992).

Furthermore, even if plaintiffs' arguments on this issue were properly before us, plaintiffs are not entitled to the benefit of the longer limitation period set forth in § 214–c(4). Plaintiffs rely exclusively on *Annunziato v. City of New York,* 164 Misc.2d 682, 624 N.Y.S.2d 544 (Sup.Ct.1995), to support their contention that they did not discover

the cause of their injuries until they tested their property in May 1992. Far from supporting plaintiffs' arguments, however, the reasoning of that case demonstrates that plaintiffs discovered the cause of their injury within the meaning of § 214–c(4) when Kohlasch informed Mancuso that the marina was contaminated by PCBs from the ConEd substation.

In *Annunziato,* the court explained that " 'the term "cause of the injury" ... should imply that the plaintiff has sufficient knowledge to bring an action.' " *Annunziato,* 624 N.Y.S.2d at 546–47 (quoting Joseph M. McLaughlin, Practice Commentaries, McKinney's Consolidated Laws of New York Annotated, Book 7B, § C214–c:4, at 635 (1990)). The court stated that sufficient knowledge "includes identification of the *substance* to which plaintiffs were allegedly exposed. It also may very well also include knowledge of the identity of the correct defendant." *Id.,* at 548. Because the plaintiffs in that case submitted affidavits stating that epidemiological studies that were the only possible method of identifying the toxic substances to which they were exposed had not yet been completed, the court held that the claims to which § 214–c(4) applied were not barred because the plaintiffs had not yet discovered the cause of their injuries. *See id.,* at 547, 549.

By contrast, in this case Mancuso has admitted that Kohlasch informed him in 1988 that the marina was contaminated by PCBs emanating from the ConEd substation. Plaintiffs were clearly aware of the toxic substance that had injured their property and of the identity of the correct defendant. According to the reasoning of *Annunziato,* plaintiffs learned of the cause of the injury to their property at the same time they learned of the damage to the marina. Accordingly, § 214–c(4) is not applicable to plaintiffs' state law claims for property damage.

Plaintiffs advance several unpersuasive arguments to the contrary. First, plaintiffs argue, as they did in disputing that they had actual knowledge of the injury to their property, that Kohlasch's statements are not sufficient to constitute knowledge of the cause of the injury. They contend that if they had brought suit in 1988 on the basis of Kohlasch's comment, they could have faced sanctions for bringing a frivolous lawsuit. We might find this argument more persuasive, if plaintiffs did not also contend that because of the lack of information available from ConEd or governmental agencies, plaintiffs had to perform their own tests at the marina in May 1992 to gather the information necessary to file this suit. *See* Plaintiffs' Memorandum in Support of Reargument, at 33. As we discussed above, plaintiffs have provided no satisfactory explanation of why they did not perform those tests within three years of learning from Kohlasch of the PCB contamination on their property. Plaintiffs have not attempted to make any showing that the scientific information that they were able to gather in 1992 could not also have been obtained within the limitation period.[10]

Plaintiffs also assert that Mancuso could not possibly know that the ConEd substation was the source of PCB contamination at the marina because of ConEd's consistent assertions that the site was cleaned of PCBs by 1987 and that no PCBs have been discharged from the substation onto plaintiffs' property. This argument merits only brief mention. A party in ConEd's position will almost invariably deny the existence of conditions that could expose it to liability. To permit plaintiffs to argue successfully that they did not know the cause of their injury because ConEd denied any wrongdoing would extend the benefits of the longer limitation period under § 214–c(4) to plaintiffs in every case in which the defendant did not concede liability. This result is patently inconsistent with the policy underlying the statutes of limitation.

---

**10.** Plaintiffs also argue that they could not have discovered the cause of the injury to their property because the scientific information available to them through governmental agencies or published in the newspapers was inconclusive. In particular, plaintiffs point out that the NYDEC had classified the substation site as Class 2a, a designation that indicates that the information about an inactive site is inconclusive and more testing will be required to determine whether the site is contaminated. The site was, however, still listed in the same category in 1992, when plaintiff conducted his own testing and brought suit. *See* ConEd Chronology of Events at Echo Bay, attached as Exhibit 7 to Plaintiffs' November 1994 Memorandum.

*Cf. United States v. Village of Island Park,* 791 F.Supp. 354, 375 (E.D.N.Y.1992).

Essentially, plaintiffs urge us to adopt a standard of "discovery of the cause of the injury" under which an allegedly injured party would not know the cause of his or her injury until he or she had obtained detailed scientific proof of the source of the injury. Given that environmental proceedings brought by governmental agencies are frequently quite lengthy and that conclusive information is often not available for years, an injured party could put off the running of the limitation period almost indefinitely by simply refusing to test his or her own property to determine without delay the extent and possible causes of contamination. We do not believe that § 214–c(4) permits plaintiffs to sit on their rights in this fashion. *Cf. Snyder v. Town Insulation, Inc.,* 81 N.Y.2d 429, 599 N.Y.S.2d 515, 518, 615 N.E.2d 999, 1002 (1993) (rejecting plaintiffs' proposed interpretation of limitation provision for personal injury, N.Y.Civ.Prac.L. & R. § 214, because "under the rule proposed by plaintiffs ..., a plaintiff would have the power to put off the running of the Statute of Limitations indefinitely.").

To summarize, we find that Mancuso had actual knowledge of the injury to the marina from PCB contamination by some time in early 1988, that plaintiffs are not entitled to the benefit of equitable estoppel, and that Judge Broderick applied the correct statute of limitations. We also find that Judge Broderick did not overlook any controlling decisions or factual matters that might have materially influenced his decision. Therefore, because plaintiffs failed to file suit within the three-year limitation period, the grant of summary judgment dismissing plaintiffs' state law claims for property damage resulting from PCB contamination was proper.

**B. Claims for Property Damage from Oil**

■ Next, plaintiffs contend that Judge Broderick overlooked their allegations of property damage to the marina from oil discharged from the substation. The complaint alleges that plaintiffs' property has been injured by PCBs "as well as organic, inorganic and other toxic pollutants." Complaint, at

¶ 1. In response to interrogatories, plaintiffs have specified that these additional pollutants include oil. *See, e.g.,* Plaintiffs' Answers to Defendant's Second Set of Interrogatories, dated April 14, 1994, at ¶¶ 2A, 3A, attached as Exhibit H to Certification in Opposition to Reargument of Richard J. Giglio, dated May 12, 1995. Plaintiffs' memorandum in opposition to ConEd's motion for partial summary judgment argued that ConEd's motion was directed only to claims for property damage from PCBs and called to the court's attention that plaintiffs also sought damages for injuries to the marina from oil. *See* Plaintiffs' November 1994 Memorandum, at 1. Judge Broderick granted summary judgment dismissing all of plaintiffs' state law claims for property damage, but relied only on his finding that Mancuso had actual knowledge of PCB contamination. Plaintiffs are therefore entitled to reargument, although we find that their claims based on allegations of damage to the marina from oil contamination were properly dismissed.

■ Mancuso testified at his deposition in this case that during the conversation in which Kohlasch informed him of the PCB contamination at the marina, Kohlasch explained that he frequently visited the ConEd site and "spoke of these oils that [the workers] used to drain into the floor drains and so forth." Mancuso Deposition Transcript, at 417. *Mancuso also admitted that he was aware by July 1989 of oil on the portion of his property directly adjacent to the substation. See* Mancuso Deposition Transcript, at 939, 1271, attached as Exhibit B to Giglio Reargument Certification. Mancuso's later statement that he believed that all of the oil he found on his property was discharged from the Thruway storm drain, *see* Plaintiffs' Memorandum in Support of Reargument at 7, may not be used to contradict his earlier deposition testimony. *See Trans–Orient Marine,* 925 F.2d at 572; *Mack,* 814 F.2d at 124; *Miller,* 755 F.2d at 24; *Perma Research,* 410 F.2d at 578. Accordingly, Mancuso had actual knowledge more than three years before he filed this action of the injury to his property from oil contamination from the ConEd substation. For reasons analo-

gous to those we discussed with respect to plaintiffs' claims for property damage from PCB contamination, summary judgment dismissing plaintiffs' state law property damage claims based on the oil discharges is appropriate.

### C. Claims for Property Damage from Dibenzofurans and Dioxins

Plaintiffs also argue that Judge Broderick overlooked the existence of their allegations of property damage to the marina from the discharge of dioxins and dibenzofurans from the ConEd substation. In response to interrogatories, plaintiffs have specified that they claim damage to their property caused by the presence of dioxins and dibenzofurans. *See, e.g.,* Answers to Second Interrogatories, at ¶ 5. Plaintiffs' memorandum in opposition to ConEd's motion for partial summary judgment called these allegations to the court's attention. *See* Plaintiffs' November 1994 Memorandum, at 1. Judge Broderick nevertheless relied only on his finding that Mancuso had actual knowledge of PCB contamination in dismissing plaintiffs' state law claims for property damage. Plaintiffs are therefore entitled to reargument, although we find once again that summary judgment is appropriate.

■ Dibenzofurans and dioxins are toxic derivatives of PCBs that are sometimes formed when PCBs are exposed to high temperatures. Plaintiffs theorize that a transformer fire in 1981 caused the creation of dibenzofurans and dioxins from PCBs at the substation. They contend that the dibenzofurans and dioxins subsequently leached into Echo Bay and onto their property. They further contend that Mancuso cannot be held to have actual knowledge of the contamination from these PCB derivatives based on the statements Kohlasch made to him, which referred explicitly only to oil and PCBs. Instead, they argue that plaintiffs first discovered the possibility that their property might be contaminated by PCB derivatives in February 1993 and first learned of the 1981 transformer fire during document discovery. *See* Plaintiffs' Memorandum of Law in Support of Reargument, at 43–44. In essence, therefore, plaintiffs contend that their allegations of property damage from dioxins and dibenzofurans constitute a separate and distinct cause of action that accrued in 1993 and therefore is not time-barred. We disagree.

Under New York law, it is well-settled that the exacerbation of an injury does not give rise to a new cause of action. *See 888 Seventh Avenue Ltd. Partnership v. AAER Sprayed Insulations, Inc.,* N.Y.L.J., Mar. 10, 1992, at 24 (Sup.Ct.), *aff'd,* 199 A.D.2d 50, 605 N.Y.S.2d 25 (1993), *leave to appeal denied,* 84 N.Y.2d 841, 617 N.Y.S.2d 129, 641 N.E.2d 150 (1994); *see also Schmidt v. Merchants Despatch Transp. Co.,* 270 N.Y. 287, 300, 200 N.E. 824, 827 (1936); *New York Seven–Up Bottling Co. v. Dow Chemical Co.,* 96 A.D.2d 1051, 466 N.Y.S.2d 478, 479–80 (1983), *aff'd,* 61 N.Y.2d 828, 473 N.Y.S.2d 973, 462 N.E.2d 150 (1984). For instance, in *888 Seventh Avenue,* the court held that damage claims brought by the owner of a building containing asbestos insulation against the manufacturers, sellers and installers of that insulation were time-barred under § 214.[11] The plaintiff in that case argued that the injury to its property occurred, and its cause of action accrued, when asbestos was released into the air during renovation of the building. The court rejected plaintiff's argument, reasoning that the injury occurred and plaintiff's cause of action accrued at or soon after the time the insulation was installed. Any additional injury to the property caused by the subsequent release of more asbestos exacerbated the damage done to the property but did not give rise to a new cause of action. *See 888 Seventh Avenue,* at 24.

Similarly, plaintiffs' assertions of their discovery of contamination from dioxins and dibenzofurans do not constitute a new cause of action. The known and major injury to plaintiffs' property was, and is, the discharge of PCBs from the substation into the marina. Plaintiffs' cause of action accrued when they discovered that injury. Plaintiffs' unsupport-

---

11. Section 214–c was not applicable because the claims accrued before the effective date of that provision. *See 888 Seventh Avenue,* at 24.

ed theorization that the damages to the marina may be somewhat greater because a small portion of the PCBs may have been converted into PCB derivatives such as dioxins and dibenzofurans does not create a new cause of action whose belated discovery exempts it from the preclusive effect of the statute of limitations.

■ Our conclusion that plaintiff's allegations of property damage from dioxins and dibenzofurans are part and parcel of their cause of action for property damage from PCB contamination is buttressed by the fact that plaintiffs have previously treated their allegations of property damage from dioxins and dibenzofurans as included in their claims for PCB contamination. Under 33 U.S.C. § 1365(b)(1)(A), plaintiffs were required to give ConEd notice of any alleged violation of the Clean Water Act sixty days before filing suit. This notice is a mandatory condition precedent to commencing an action. *See Hallstrom v. Tillamook County*, 493 U.S. 20, 31, 110 S.Ct. 304, 311, 107 L.Ed.2d 237 (1989) (interpreting identical notice requirement under RCRA); *National Env. Found. v. ABC Rail Corp.*, 926 F.2d 1096, 1097–98 (11th Cir.1991). Plaintiffs' notice stated only that ConEd was illegally discharging PCBs into Echo Bay and into the marina. Plaintiffs did not mention any other toxic substances. Nevertheless, almost from the beginning of this case, plaintiffs have contended that they are entitled to recover for property damage caused by dibenzofurans and dioxins. Plaintiffs clearly consider their allegations on this issue to be part of their cause of action for PCB contamination.

Accordingly, summary judgment dismissing plaintiffs' state law claims for property damage to their property based on allegations of contamination from dioxins and dibenzofurans is granted.

## II. Rule 60(b) Motion

Plaintiffs have also moved pursuant to Fed.R.Civ.P. 60(b)(2) for relief from the entry of judgment dismissing their state law claims for property damage on the ground that they have discovered new evidence. A movant "seeking relief under Rule 60(b)(2) must demonstrate that (1) newly discovered evidence is of facts existing at the time of [decision]; (2) the moving party is excusably ignorant of the facts despite using due diligence to learn about them; (3) the newly discovered evidence is admissible and probably effective to change the result of the former ruling; and (4) the newly discovered evidence is not merely cumulative ... of evidence already offered." *Weissmann v. Freeman*, 120 F.R.D. 474, 476 (S.D.N.Y.1988) (citing 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure §§ 2808, 2859 (1995)); *see also Long v. Carberry*, 151 F.R.D. 240, 243 (S.D.N.Y.1993). The Second Circuit has held that "[m]otions under Rule 60(b) are addressed to the sound discretion of the district court and are generally granted only upon a showing of exceptional circumstances." *Mendell ex rel. Viacom, Inc. v. Gollust*, 909 F.2d 724, 731 (2d Cir.1990), *aff'd*, 501 U.S. 115, 111 S.Ct. 2173, 115 L.Ed.2d 109 (1991); *Fulani v. Brady*, 149 F.R.D. 501, 505 (S.D.N.Y.1993), *aff'd*, 35 F.3d 49 (2d Cir. 1994).

■ Plaintiffs have submitted voluminous affidavits detailing the evidence they purportedly have discovered since Judge Broderick granted partial summary judgment in ConEd's favor on December 12, 1994. That evidence includes the discovery of: (1) a United States Coast Guard Report that details both the spread of oil from a leak at Shoreline onto ConEd's property, where it mixes with PCBs and then leaches into the marina, and the presence of oil in the Bay that could not be traced to Shoreline, but that is consistent with the type of oil ConEd used in its transformers; (2) an underground dry well that may be leaching oil, PCBs and dioxins into the marina; (3) two underground pipes that appear to connect to the dry well and that may also discharge into the marina; (4) a fluid-filled underground structure near the border of ConEd's and Shoreline's properties that may be leaking toxic substances; (5) a buried concrete vault filled with oil that appears to drain into Echo Bay; (6) an underground concrete tunnel that apparently is connected to other underground structures and discharges into Echo Bay; (7) a leaking water main that has been discharging fresh

water into the area where ConEd's groundwater monitoring wells are located, perhaps calling into question the validity of ConEd's previous testing for PCBs; (8) an underground septic tank that may be leaching oil and other contaminants into the marina; (9) the results of tests that ConEd conducted in May 1995 on its property and on plaintiffs' that tend to show that PCBs are present at the marina; and (10) discovery materials that plaintiffs obtained from Shoreline's environmental contractor that plaintiffs contend demonstrate that no PCBs were found in the oil from Shoreline's pipeline, thereby tending to rule out Shoreline as a source of the contamination. Plaintiffs characterize this information as the discovery of new causes of injury to the marina of which they could not have learned before Judge Broderick issued his ruling on December 12, 1994.

Assuming that the evidence to which plaintiffs refer has all been discovered since December 12, 1994, and that all of the structures and points of discharge that plaintiffs describe existed before that date, plaintiffs are nevertheless unable to satisfy the standard for relief under Rule 60(b)(2). The new evidence that plaintiffs have provided is both unlikely to change the prior decision and cumulative. First, Judge Broderick's decision was based on Mancuso's actual knowledge, by some time in early 1988, of PCB contamination present at the marina as a result of discharges from the ConEd substation. For obvious reasons, the discovery of new evidence that tends to show that ConEd is responsible for discharging PCBs into Echo Bay is unlikely to convince us that Judge Broderick erred in reaching that conclusion.

Second, the newly discovered evidence is cumulative when considered in conjunction with evidence that plaintiffs possessed prior to Judge Broderick's decision. In responses to interrogatories, dated April 14, 1994, plaintiffs contended that dioxin, dibenzofurans and PCBs had travelled and continued to travel through the underground storage and drainage system at the substation, which then discharged those pollutants into Echo Bay and into the marina. *See* Answers to Second Interrogatories, at ¶¶ 5–6. Plaintiffs

also contended that ConEd's underground storage and drainage system leached oil onto plaintiffs' property. *See id.,* at ¶¶ 2A, 3A. Furthermore, plaintiffs appeared before Magistrate Judge Fox on December 1, 1994, and described a number of pipes that discharge oil onto plaintiffs' property. *See* Transcript of Status Conference, dated December 1, 1994, at 13–14, attached as Exhibit L to Giglio Reargument Certification. From these materials, it is apparent that plaintiffs have consistently advanced their theory that pollutants are being discharged into Echo Bay and into the marina through the system of pipes, tunnels and tanks buried beneath the substation. Newly discovered evidence that supports this argument is merely cumulative of what was previously before the court.

■ In essence, plaintiffs' argument is that each new point of discharge that they discover should ground a new cause of action for which the limitation period has not yet run. At most, however, plaintiffs' new evidence tends to show that the injury to their property is ongoing. Under New York law, allegations of continuing injury will not defeat the application of § 214–c where the discovery of the injury occurred more than three years before plaintiffs filed suit. *See Jensen,* 603 N.Y.S.2d at 425, 623 N.E.2d at 552. Plaintiffs have therefore failed to demonstrate that the newly discovered evidence they have presented justifies relief from the judgment dismissing their state law claims for property damage.

### CONCLUSION

For the reasons set forth above, to the extent that plaintiffs' state law claims for property damage are premised on allegations of PCB contamination, plaintiffs' motion for reargument is denied. Plaintiffs' motion for reargument is granted to the extent that we have reconsidered the grant of summary judgment dismissing plaintiffs' state law claims for property damage that are premised on allegations of contamination from oil, dibenzofurans and dioxins. Upon reconsideration, summary judgment dismissing those claims is granted. Plaintiffs' motion for re-

lief from the judgment pursuant to Fed. R.Civ.P. 60(b)(2) is denied.

SO ORDERED.