Frank **MANCUSO, Ellen Mancuso, individually and on behalf of their children, Deanna and Theresa Mancuso and F. Mancuso Boat Yard, Inc. d/b/a Echo Bay Marine, Plaintiffs,**

v.

**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Defendant.**

No. 93 CIV. 0001(WCC).

United States District Court, S.D. New York.

July 6, 2004.

Whalen & Whalen, Dover Plains, NY (Thomas J. Whalen, of Counsel), for plaintiffs.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs have moved pursuant to FED. R. CIV. P. 60 for an order vacating the Opinion and Order of this Court entered February 16, 2001 and affirmed by the Court of Appeals for the Second Circuit on January 2, 2002, on the ground that it was "procured by fraud upon the Court." *Mancuso v. Consol. Edison Co. of New York,* 130 F.Supp.2d 584 (S.D.N.Y.2001), *aff'd,* 25 Fed.Appx. 12 (2d Cir.2002) (unpublished opinion). For the reasons stated herein, the motion is denied.

## BACKGROUND

The following facts are briefly digested from the several prior opinions in this case, familiarity with which is presumed. In 1987, plaintiff Frank Mancuso ("Mancuso") purchased a marina at Echo Bay in New Rochelle, New York, and moved his family onto the premises in 1988. In May 1993, the property was acquired by the City of New Rochelle at a foreclosure sale for non-payment of real estate taxes. Earlier in 1993, plaintiffs had brought this action under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251–1387, against defendant Consolidated Edison Co. of New York ("Con Ed"), alleging that a transformer fire at Con Ed's neighboring Echo Avenue substation in 1981 had resulted in a spillage of polychlorinated biphenyls ("PCBs"), which are known carcinogens that not only contaminated the soil at the substation, but leached into Echo Bay, polluting the water, causing the family to suffer various illnesses and financially ruining the marina. On December 12, 1994, Judge Broderick, to whom the case was initially assigned, dismissed all the claims for property damage as barred by the applicable three-year statute of limitations. On plaintiffs' motion for reconsideration, this Court adhered to that decision. 905 F.Supp. 1251, 1265 (S.D.N.Y.1995). On July 16, 1999, this Court granted defendant's motion for summary judgment and dismissed the action with prejudice based upon plaintiffs' failure, after six years of effort, to secure competent expert testimony that would support their claims of personal injury caused by PCB exposure. 56 F.Supp.2d 391, 411 (S.D.N.Y. 1999). Plaintiffs appealed and on June 5, 2000, the Second Circuit affirmed the dismissal of the personal injury claim, but remanded for consideration of the claim for environmental damage under the CWA. 216 F.3d 1072, 2000 WL 730417 (2d Cir.2000) (unpublished table opinion).

On remand, this Court entered the subject Opinion and Order dismissing plaintiffs' CWA claim on the ground, *inter alia,* that there was no cognizable environmental injury to be redressed. 130 F.Supp.2d at 596. The substation had been closed since 1981 and the only significant activity at the site since that time had been an extensive program of soil decontamination and remediation conducted by defendant under the direction of the New York Department of Environmental Conservation ("DEC"). *Id.* at 593–94. As the work progressed, the DEC repeatedly tested soil and water samples taken from the substation site and from Echo Bay until, by 1999, the DEC concluded that any PCBs present were at such low levels as to pose no hazard to wildlife or humans and that no further remediation was required either at Echo Bay or at the substation site itself. *Id.* at 594. Plaintiffs' standing to bring a citizen suit under the CWA was based on the alleged offense to their aesthetic sensibilities when they viewed Echo Bay on their occasional visits to the area. *Id.* at 590–91. But, as this Court observed, Mancuso had moved his family to Dutchess County, New York in 1993 and

had thereafter visited Echo Bay only sporadically to observe and photograph the cleanup operations at the substation. *Id.* at 586–87, 596. Moreover, if there was any minute PCB contamination of the water in the Bay during that period, they could not have detected it, because PCBs are colorless and odorless. *Id.* at 593. Mancuso's claim that he had observed wildlife that had been killed or maimed by PCB exposure was questionable because, although he took hundreds of photographs of the area for possible use as evidence in the suit, he produced none showing dead or deformed wildlife. *Id.* Finally, even if he had seen such conditions, it was doubtful that they were caused by PCB exposure in view of the frequent and exhaustive testing by the DEC without finding PCB contamination at potentially harmful levels. *Id.*

This Court further observed that this extensive remediation was well underway before the present lawsuit was commenced and that its successful completion was in no way attributable to the suit. *Id.* at 596. Thus, this action had served no remedial purpose and the only significant reason for its continuation to trial was to pursue a highly questionable claim for attorneys' fees, which is not an appropriate use of limited judicial resources. *Id.*

Plaintiffs appealed and on January 2, 2002, the Second Circuit affirmed that decision in a Summary Order stating:

> The Mancusos premise standing chiefly on violation of their aesthetic sensibilities when they resort to the site for recreation.... However, the record here demonstrates nothing more than that the Mancusos visited Echo Bay in order to prepare for this litigation. Their aesthetic sensibilities may have been injured in the course of these visits, but the Mancusos do not currently reside, own property, or recreate in, on,

or near Echo Bay; they do not "use" Echo Bay for any purpose other than to obtain evidence to support this lawsuit. Any aesthetic injury experienced as a result of these visits is therefore simply a byproduct of this lawsuit and cannot satisfy even the minimal showing of injury-in-fact needed to meet the standing requirement.

25 Fed.Appx. at 12.

## DISCUSSION

Plaintiffs' motion to vacate this Court's Opinion and Order of February 16, 2001 is based upon their discovery of: (1) a letter dated April 11, 2002 from the DEC to Con Ed stating that the DEC had approved a work plan for additional remediation work to be performed by Con Ed at the substation site and directing that the work proceed without further delay; and (2) a Remediation Report Addendum, dated July 2003, prepared by Lawler, Matusky & Skelly Engineers LLP, stating that: (a) a sample of soil taken at a depth of 2–2.5 feet from the wall of an excavation made for removal of a drain pipe at the substation site was tested and showed a PCB content of 9.1 mg/kg; and (b) that "The mudflat area of Echo Bay, adjacent to the upland portion of the site, will be remediated by Con Edison in the near future. Once the mudflat area is remediated, the site should be in a position for NYSDEC to delist it from the Registry."

Plaintiffs argue that these documents establish that Con Ed had committed "fraud upon the Court" in convincing both this Court and the Court of Appeals that there was no further need for remediation of the area and therefore no redressable injury to confer standing on plaintiffs. That argument is not persuasive. In the first place, plaintiffs' claim under the CWA is based on the offense to their aesthetic sensibilities caused by the alleged pollution

of Echo Bay. The detection of PCBs *at a depth of over two feet into the subsoil at the substation* could have no conceivable effect on the aesthetic appearance of Echo Bay. Moreover, the amount detected was equivalent to only 9.1 parts per million ("ppm"). As noted in this Court's Opinion and Order of February 16, 2001, the Environmental Protection Agency permits PCB levels up to 50 ppm in industrial areas and up to 10 ppm in residential areas. 130 F.Supp.2d at 594 (citing 40 C.F.R. § 765.120(c)(2)(ii)).

The reference to remediation of the mudflat area of Echo Bay does not indicate the level of PCB concentration, if any, detected in that area, and there is no reason to believe that it could have affected in the slightest degree the aesthetic appearance of the area. Therefore, even assuming that this Court and the Court of Appeals were misled into believing that no further remediation work was needed in the area, this would not affect the decision. There would still be no injury redressable by this lawsuit. The additional remediation work referred to in the 2002 and 2003 documents submitted by plaintiffs has clearly been completed long before now. Nor did the lawsuit ever produce any beneficial result. The remediation project was planned and was being aggressively pursued long before this lawsuit was brought and was completed after the suit had been dismissed. Finally, and most importantly, the new evidence submitted by plaintiffs does not in any way alter or reduce the impact of the facts supporting the Second Circuit's conclusion that, even if the aesthetic sensibilities of the Mancusos were offended during their occasional visits to Echo Bay to obtain evidence for this lawsuit, that injury is "simply a by-product of this lawsuit and cannot satisfy even the minimal showing of injury-in-fact needed to meet the standing requirement." 25 Fed.Appx. at 12. Thus, even if the

Courts were misled as to whether the remediation had been fully completed, that would not confer standing on plaintiffs to bring a private action under the CWA.

## CONCLUSION

For all of the foregoing reasons, plaintiffs' motion pursuant to FED. R. CIV. P. 60 to vacate this Court's Opinion and Order of February 16, 2001 is denied.

SO ORDERED.