## In re PFOHL BROTHERS LANDFILL LITIGATION.

**This Document Relates to All Actions.**

**No. 95–CV–0020A.**

United States District Court,
W.D. New York.

Sept. 22, 1999.

See also, 26 F.Supp.2d 512.

Baron & Budd, P.C., Frederick M. Baron and Laura J. Van Pelt, of Counsel, Dallas, TX, for Plaintiffs.

Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria LLP, Laraine Kelley, of Counsel, Buffalo, NY, for Plaintiffs.

Nixon, Hargrave, Devans & Doyle LLP, Laurie Styka Bloom, of Counsel, Buffalo, NY, Counsel for the Liaison Group Defendants.

### ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Leslie G. Foschio, pursuant to 28 U.S.C. § 636(b)(1), on February 16, 1996. On November 5, 1997, defendants filed a motion for partial summary judgment on statute of limitations grounds. On February 12, 1999, Magistrate Judge Foschio filed a Report and Recommendation, recommending that defendants' motion for partial summary judgment should be de-

nied as to Harry Basinski, Ellen Basinski, Raymond Freier and Rose Freier and granted as to Grace Astor, Kevin Batt, Patricia Batt, Geraldine Davies, Morley Davies, Robert Fiels, Annabel Foisset, Leo Foisset, Carl Forman, Nancy Forman, Raymond Freier, Rose Freier, Tab Fuqua, Helen Hancock, Marlene Lamancuso, Michael Lamancuso, Louis Manolis, Marie Manolis, Donald McKowan, Donna McKowan, Charlotte Mucha, Flora Mueller, Franklin Mueller, William Nielsen, Norman Wagner and Mary Ylmar.

Plaintiffs filed objections to the Report and Recommendation. Oral argument on the objections was held on August 5, 1999.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions and hearing argument from the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Foschio's Report and Recommendation,[1] defendants' motion for partial summary judgment is: (1) denied as to Harry Basinski (based on his prostate cancer [2]), Ellen Basinski (loss of consortium claim based on Harry Basinski's claim), Raymond Freier (based on his loss of consortium claim asserted with respect to Rose Freier's personal injury claims limited to her liver and throat cancers), and Rose Freier (based on her personal injury claims limited to her liver and throat cancers); and (2) granted as to Grace Astor, Kevin Batt, Patricia Batt,

1. The Court notes that in addition to the reasons cited by Magistrate Judge Foschio in his Report and Recommendation, plaintiffs' own expert report appears to indicate that by the end of 1991, plaintiffs had enough information available to them so that they reasonably should have suspected the cause of their re-

spective cancers at that time. *See* Item No. 563.

2. In their objections, plaintiffs claim that Mr. Basinski's claim is based on colon cancer, not prostrate cancer. The Court will leave this issue for Magistrate Judge Foschio to resolve.

Geraldine Davies,[3] Morley Davies, Robert Fiels, Annabel Foisset, Leo Foisset, Carl Forman, Nancy Forman, Raymond Freier (as to his personal injury and failure to warn claims), Rose Freier (as to her loss of consortium claim relative to Raymond Freier's personal injury claim), Tab Fuqua, Helen Hancock, Marlene Lamancuso, Michael Lamancuso, Louis Manolis, Marie Manolis, Donald McKowan, Donna McKowan, Charlotte Mucha, Flora Mueller, Franklin Mueller, William Nielsen, Norman Wagner and Mary Ylmar.

The case is referred back to the Magistrate Judge for further proceedings.

IT IS SO ORDERED.

REPORT and RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

## JURISDICTION

This case was referred to the undersigned by the Honorable Richard J. Arcara on February 16, 1996, for report and recommendation on all dispositive motions. It is presently before the court on Defendants' motion for partial summary judgment (Docket Item Number 343), filed November 5, 1997.

## BACKGROUND

This action was commenced on January 10, 1995, by the filing of the first of six essentially identical complaints on behalf of 63 Plaintiffs, suing on behalf of themselves or their respective decedents, in which Plaintiffs seek monetary damages including punitive damages from Defendants for injuries or deaths from various cancers which they contend were caused by exposure to hazardous and toxic substances from the Pfohl Brothers Landfill

located in Cheektowaga, New York (the "Landfill").

Originally assigned to Hon. John T. Elfvin, this matter was transferred to Hon. Richard J. Arcara by order dated October 15, 1995. Judge Arcara, by order dated February 16, 1996, consolidated these actions for all pre-trial purposes. That order was also made applicable to any future related cases. The pending summary judgment motion pertains to six separately filed actions including (1) *Frier v. Westinghouse*, No. 95–CV–20A(F), filed January 10, 1995 (*"Freier"*), which covers the claims pertaining to Plaintiffs Raymond Freier, Tab Fuqua and Charlotte Mucha, (2) *Batt v. Westinghouse*, No. 95–CV–107A(F), filed February 14, 1995 (*"Batt"*), which covers the claims pertaining to Plaintiffs Leo Foisset, Helen Hancock, Flora Mueller, Franklin Mueller and William Nielsen, (3) *Astor v. Westinghouse*, No. 95–CV–247A(F), filed March 29, 1995 (*"Astor"*), which covers the claims pertaining to Plaintiffs Grace Astor, Ellen Basinski, Harry Basinski, Louis Manolis, Marie Manolis and Mary Ylmar, (4) *Davies v. Westinghouse*, No. 95–CV–444A(F), filed June 5, 1995 (*"Davies"*), which covers the claims pertaining to Plaintiffs Kevin Batt, Patricia Batt, Geraldine Davies, Morley Davies, Annabel Foisset, Rose Freier, Donald McKowan, Donna McKowan and Norman Wagner, (5) *Fiels v. Westinghouse*, No. 96–CV–395A(F), filed June 17, 1996 (*"Fiels"*), which covers the claims of Plaintiffs Robert Fiels, Carl Forman and Nancy Forman, and (6) *Anthony v. Westinghouse*, No. 97–CV–19A(F), filed January 10, 1997 (*"Anthony"*), which covers the claims pertaining to Plaintiffs Marlene Lamancuso and Michael Lamancuso.[1,2]

---

3. Plaintiffs claim in their objections that Geraldine Davies was diagnosed with bladder cancer in September 1998 and ask that the Court modify the Report and Recommendation so as to deny summary judgment with respect to her bladder cancer claim and Morley Davies' loss of consortium claim with respect thereto. The Court will leave this issue for Magistrate Judge Foschio to resolve.

1. As filed, the summary judgment motion also seeks to dismiss loss of consortium claims originally asserted by Patricia Wagner in *Davies* and by Delores Fiels in *Fiels*. However, those two claims have voluntarily discontinued by Plaintiffs. *See* Decision and Order dated August 31, 1998 (Docket Item Number 504) at 27–28.

The personal injury claims are based on New York law negligence, strict liability, gross negligence, wrongful death, loss of consortium and failure to warn. The instant actions are being maintained by Plaintiffs who were alive when their complaint were first filed as well as estate representatives on behalf of five Plaintiffs who died since suit was commenced. Plaintiffs allege that they lived, worked or engaged in recreational activity in the vicinity of the Landfill and that Defendants either owned and operated the Landfill or were otherwise responsible for the generation or transportation of the hazardous substances to the Landfill. Federal subject matter jurisdiction is based on diversity of citizenship.

The instant motion seeks summary dismissal of the personal injury, failure to warn, wrongful death and loss of consortium claims asserted on behalf of 28 Plaintiffs, most of which would be time-barred under New York law. Plaintiffs urge that these claims are nevertheless timely under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 *et seq.*, ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 100 Stat. 1613, specifically, § 309, codified as 42 U.S.C. § 9658 ("§ 9658"), which, by preempting the accrual date for state law toxic tort actions based on exposure to hazardous substances released into the environment by facilities as defined by CERCLA, permits such claims to accrue upon the discovery of the cause of the injury.[3] Pursuant to § 9658, a toxic tort action accrues upon the federally required commencement date ("FRCD"), which is the date the cause of a plaintiff's injury is, or with reasonable diligence should be, discovered. On February 16, 1996, Defendants were granted a period of discovery limited to their statute of limitations defense.

On June 11, 1997, Defendants filed a motion for partial summary judgment seeking dismissal of the survival and wrongful death actions on behalf of 20 decedents and the consortium claims on behalf of eight surviving spouses as time-barred under the applicable New York statutes of limitations and challenging the applicability and constitutionality of § 9658. In a Report and Recommendation issued on March 11, 1998, adopted by Judge Arcara on October 27, 1998, the court found, *inter alia,* that although some of the survival actions were barred under New York limitations statutes, the specific New York statute applicable to accrual of toxic tort actions was partially preempted by the FRCD and that the FRCD violated neither the Commerce Clause nor the Tenth Amendment. *In re Pfohl Brothers Landfill Litigation,* 26 F.Supp.2d 512 (W.D.N.Y.1998) (*"Pfohl I"*). Summary judgment was denied as a genuine issue of material fact as to the correct FRCD existed. *Id.*

On November 5, 1997, Defendants moved for summary judgment to dismiss the personal injury and loss of consortium claims of the surviving Plaintiffs, asserting that § 9658 is unconstitutional, inapplicable to the instant claims, or, if applicable, that it does not render these actions timely as the causes of action accrued earlier than Plaintiffs assert.[4] Plaintiffs filed their re-

---

2. A seventh action, *Minier v. Westinghouse,* 98–CV–560A(F) was commenced on September 8, 1998, in which Jeff Minier as Executor of the Estate of Arthur Minier and Jean Minier, as surviving spouse of Arthur Minier, allege causes of action including personal injury, failure to warn, wrongful death and loss of consortium based on Arthur Minier's cancer and death which allegedly were caused by exposure to hazardous and toxic substances deposited into the Landfill. As this action was commenced after the instant summary judgment motion was filed, those claims are not before the court on summary judgment.

3. For convenience, the court refers to an action based on an exposure to an alleged hazardous substance as a "toxic tort."

4. Defendants did not argue in support of their previous summary judgment motion (*see Pfohl I* at 529 n. 15) seeking dismissal of the survival and wrongful death action that those claims were untimely even if the FRCD is

sponses on December 24, 1997 and Defendants replied on January 20, 1998. Oral argument was deemed unnecessary.

Between October 28, 1997 and November 7, 1997, Plaintiffs made six motions to amend the six separate complaints filed in *Freier, Batt, Astor, Davies, Fiels* and *Anthony*. Those motions became moot on December 11, 1997 when Plaintiffs filed amended motions to amend the complaints. On August 31, 1998, thee motions were granted insofar as they sought to (1) dismiss four Defendants, namely W.S. Tyler, Inc., Browning–Ferris Industries, Inc., Waste Management, Inc., F.N. Burt Company, and Litton Services, Inc., (2) dismiss loss of consortium claims asserted by two Plaintiffs, (3) assert a failure to warn claim, (4) amend the factual allegations of the complaints as to when the cause of Plaintiffs' injuries was discovered, (5) with respect to five Plaintiffs who had died since commencing suit, Rose Freier, Annabel Foisset, Leo Foisset, Helen Hancock and Louis Manolis, substitute representatives of such deceased Plaintiffs' estates as Plaintiffs, and (6) assert wrongful death claims on behalf of the now deceased Plaintiffs. The remaining allegations contained in the original complaints were unchanged. Plaintiffs filed the amended complaints on October 1, 1998. (Docket Items Numbers 511 (*Anthony* ), 512 (*Freier* ), 513 (*Davies* ), 514 (*Batt* ), 515 (*Fiels* ) and 516 (*Astor* )).

As noted, the instant motion seeks summary dismissal of the personal injury claims asserted as to 20 Plaintiffs, specifically Grace Astor, Harry Basinski, Kevin Batt, Geraldine Davies, Robert Fiels, An-

nabel Foisset, Leo Foisset, Nancy Forman, Raymond Freier, Rose Freier, Tab Fuqua, Helen Hancock, Michael Lamancuso, Louis Manolis, Donna McKowan, Charlotte Mucha, Franklin Mueller, William Nielsen, Norman Wagner and Mary Ylmar. Dismissal of claims for loss of consortium brought by Ellen Basinski, Patricia Batt, Morley Davies, Delores Fiels, Leo Foisset, Annabel Foisset, Carl Forman, Rose Freier, Raymond Freier, Marlene Lamancuso, Marie Manolis, Donald McKowan, Flora Mueller and Patricia Wagner is also sought.[5] See Amended Complaints filed in *Anthony* (Docket Item Number 511), at ¶ 32, *Freier* (Docket Item Number 512), at ¶ 30, *Davies* (Docket Item Number 513), at ¶ 33, *Batt* (Docket Item Number 514), at ¶ 36, *Fiels* (Docket Item Number 515), at ¶ 30 and *Astor* (Docket Item Number 516) at ¶ 32.

According to the amended complaints, Plaintiffs allege that the FRCD, *i.e.*, the earliest date on which it became possible to discover the cause of their injuries is December 1994.

For the reasons which follow, Defendants' motion for partial summary judgment should be DENIED as to Harry Basinski (based on his prostate cancer), Ellen Basinski (based on her loss of consortium claim), Raymond Freier (based on his loss of consortium claim asserted with respect to Rose Freier's personal injury claims limited to her liver and throat cancers) and Rose Freier (based on her personal injury and failure to warn claims limited to her liver and throat cancers), and GRANTED as to Grace Astor, Kevin Batt, Patricia Batt, Geraldine Davies, Mor-

---

constitutional and applicable to the state toxic tort claims and, accordingly, the court did not consider whether, as requested by the instant motion, those claims were nonetheless untimely despite the FRCD's applicability.

5. Six Plaintiffs have died since suit was commenced including Ellen Basinski who maintained a loss of consortium claim relative to her husband Harry Basinski's personal injury claim, and Annabel Foisset, Leo Foisset, Rose Freier, Helen Hancock and Louis Manolis

who maintained personal injury and failure to warn claims on their own behalf. As those Plaintiffs were alive when their particular actions were filed, dismissal of their claims is properly sought by this motion for summary judgment rather than the earlier summary judgment motion which pertained to wrongful death and survival actions asserted on behalf of persons who were deceased prior to commencing legal action. *See* Discussion, *infra*, at 250.

ley Davies, Robert Fiels, Annabel Foisset, Leo Foisset, Carl Forman, Nancy Forman, Raymond Freier (as to his personal injury and failure to warn claims), Rose Freier (as to her loss of consortium claim relative to Raymond Freier's personal injury claim), Tab Fuqua, Helen Hancock, Marlene Lamancuso, Michael Lamancuso, Louis Manolis, Marie Manolis, Donald McKowan, Donna McKowan, Charlotte Mucha, Flora Mueller, Franklin Mueller, William Nielsen, Norman Wagner and Mary Ylmar.

## FACTS [6]

The Landfill encompasses 120 acres of the northeastern corner of the Town of Cheektowaga, New York, a suburban area adjacent to the City of Buffalo. Since 1983, the Landfill has been listed on the New York State Registry of Active Hazardous Waste Disposal Sites, indicating that the state considers the Landfill to be a public health threat. It is undisputed that industrial wastes including hazardous substances were deposited into the Landfill between 1932 and 1969. Three tributaries to Ellicott Creek flow through the landfill and Aero Lake is adjacent to the northwestern corner of the Landfill.

Many of the Plaintiffs claim that over a number of years they regularly hunted, biked, and walked in the vicinity of the Landfill. Children often played in the Landfill and built "play forts" out of debris found there. Some Plaintiffs stated at their depositions to crossing the Landfill on their way to Aero Lake where they swam and fished. Most Plaintiffs admitted that they observed landfill waste, including leaking, rusting barrels, discarded x-rays, and what appeared to be chemical deposits, and some admitted that they removed items from the Landfill for personal household use. Many of the Plaintiffs who reside in the vicinity of the Landfill report-

ed that their property was occasionally flooded when Ellicott Creek overflowed.

Plaintiffs in this action have filed claims based on negligence, strict liability, gross negligence, failure to warn, loss of consortium, and wrongful death for injuries or deaths to their respective decedents whose deaths they contend were caused by exposure to hazardous and toxic substances in the Landfill. The Pfohl Defendants are the owners and were the operators of the Landfill as well as the companies which assertedly generated and transported the hazardous and toxic substances to the Landfill. According to Plaintiffs, Defendants' negligence is based upon their failure to take adequate precautionary measures to properly contain and prevent the hazardous substances deposited into the Landfill from escaping and migrating out of the Landfill and its surrounding area where Plaintiffs and their decedents resided, as well as their failure to warn Plaintiffs of the danger the Landfill posed to their health. Plaintiffs allege exposure occurred through contact with the ambient air and ground water when their decedents lived, worked or engaged in recreational activity in the vicinity of the Landfill.

Among the toxic substances allegedly deposited in the Landfill are polychlorinated biphenol ("PCB") oils, acetone, trichloroethane, 3-tricloroethane, perchloroethylene, trichloroethylene, tetrachloroephylene, coolant oil, paint treatment, waste cutting oils, degreasing materials, hydraulic oil, waste paint, industrial wastes, fluorinated solvent waste, cobalt, mercury, toluene, vinyl toluene, benzene, xylene, methylene fluoride, lead, lead driers, calcium, cadmium, zinc oxide, curing sulfur, dry metal dust, sand blast grit, foundry wastes, pine tar pitch, pickling solutions, titanium tetrachloride, polyvinyl alcohol film wastes, polyvinyl chloride, naptha, mek, waste inks, heavy metal wastes, paint thinners, paint sol-

---

**6.** The fact statement is taken from the complaints, answers, and other papers filed in this action.

vents, industrial solvents, zirconium sludge, phenolic sludges, and paint sludges such as zinc, tin, chrome, iron, nickel, copper, asbestos, phenol, and fly ash.

Defendants who operated manufacturing facilities within the Western New York region and who it is alleged negligently released and disposed of hazardous substances into the Landfill include Westinghouse Electric Corporation during the years 1946 through 1969, General Motors Corporation from the 1950's through 1968, Curtiss–Wright Corporation during the years 1947 through 1966, Laidlaw Waste Systems, Inc., individually, and as successor in interest to U.S. Rubber Reclaiming Co., Inc., during the 1950's and 1960's, Warner Lambert Company, through its subsidiary American Optical, during the 1950's and 1960's, American Standard, Inc., during the 1950's and 1960's, Howden Fan Company, f/k/a/ Buffalo Forge, during the 1950's and 1960's, Carborundum Company for the time period 1951 through 1967, and E.I. Dupont deNemours, from 1955 through 1968.

Defendants who it is alleged negligently transported and deposited hazardous substances into the Landfill include Rapid Disposal Services, Inc., and Niagara Sanitation Company, Inc., during the 1950's and 1960's,[7] and Dresser Industries, Inc., during the 1950's and 1960's.

Plaintiffs allege that the cause of their cancers were not discovered before December 1994. This allegation is based in part on the issuance of the Pfohl Environmental Health Study prepared in 1994 by David A. Rigle, M.D. and William R. Sawyer, Ph.D., ABFE ("the Rigle–Sawyer Report"), at the request of Plaintiffs' attorneys. Plaintiffs maintain that it was only when the results of the Rigle–Sawyer Report were shared with them in 1994 and 1995 that they believed a connection between the hazardous and toxic substances deposited in the Landfill and their cancers existed.

## DISCUSSION

Summary judgment of a claim or defense will be granted when the moving party demonstrates that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir.1991). The moving party for summary judgment bears the burden of establishing the nonexistence of genuine issue of material fact. If there is any evidence in the record based upon any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party cannot obtain a summary judgment. *Celotex, supra,* at 331, 106 S.Ct. 2548.

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no issue as to any material fact, and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson, supra,* at 247–48, 106 S.Ct. 2505.

Defendants have moved for partial summary judgment seeking dismissal of the claims of 28 Plaintiffs on statute of limitations grounds, arguing such claims are time-barred because § 9658 does not apply to the asserted causes of action, and, alternatively, that the statute is unconstitutional as beyond the scope of congressional legislative power under the Commerce Clause and violates the Tenth Amendment. Defendants further assert that Plaintiffs'

---

7. These companies were subsequently acquired by Browning–Ferris, Inc.

loss of consortium claims must be dismissed as they are derivative of the underlying survival actions on which they are based and therefore are also time-barred. Finally, Defendants argue that the claims for punitive damages must be dismissed as such claims are both legally insufficient and their timeliness is dependent on the underlying time-barred personal injury and loss of consortium claims.

The court will therefore first determine whether Plaintiffs' claims are time-barred under relevant state law and if so, whether § 9658 is applicable and, to the extent applicable, its preemptive effect on New York law. If the state law is preempted, the court will examine whether Defendants' argument that even if § 9658 pertains to these actions they are, nevertheless, untimely as the FRCD occurred no later than the end of 1991. The court will also again address the constitutionality of § 9658.[8] Finally, the court will determine whether Plaintiffs' loss of consortium and punitive damages claims may proceed.

### 1. Statute of Limitations

■ The timeliness of a claim in federal court under diversity jurisdiction, 28 U.S.C. § 1332(a), is governed by the statute of limitations for the state in which the court sits. *Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 109–110, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Personis v. Oiler*, 889 F.2d 424 (2d Cir.1989). Accordingly, this analysis begins with an ap-

plication of the relevant New York statutes of limitations. Based on this analysis, the court finds that most of Plaintiffs' claims are time-barred.

#### a. The Timeliness of Plaintiffs' Claims under New York Law

■ In New York, the general limitations period for personal injury torts, including personal injury and survival actions, based on negligence, strict liability, gross negligence and loss of consortium is three years measured from the date of the injury. N.Y. Civ. Prac. L. & R. § 214(5) (McKinney, 1990)(" § 214(5)"). This so-called "first exposure rule" was judicially established in *Schmidt v. Merchants Despatch Transp. Co.*, 270 N.Y. 287, 200 N.E. 824 (1936), and remains, for most torts, the traditional rule in New York. *Blanco v. American Telephone and Telegraph Co.*, 90 N.Y.2d 757, 666 N.Y.S.2d 536, 689 N.E.2d 506, 509 (1997)(holding that a cause of action in a case of latent injuries accrues under the traditional rule upon plaintiff's initial exposure).

In the case of toxic torts, under § 214(5), the date of first exposure to the hazardous substance would ordinarily be the infliction of the initial injury. *Blanco, supra, Schmidt, supra.* Here, Plaintiffs seek recovery for their own, or their decedents', injuries based on exposure to toxic substances that first occurred between 1917 and 1976. Defendants' Exhibit 7–13, and 9–15,[9] respectively. All the instant

8. The court previously found that § 9658 was constitutional in the Report and Recommendation issued with regard to the previous summary judgment motion. *Pfohl I,* at 539–46. That Judge Arcara agreed with the court's finding is evident by his adoption of the findings contained in that Report on October 27, 1998. *Pfohl I* at 516.

9. Defendants, in support of the instant motion for summary judgment, submitted seven volumes of exhibits containing a total of 69 exhibits with each page of each exhibit separately numbered. Likewise, Plaintiffs, in opposition to the instant motion, submitted eight volumes of exhibits containing a total of 40 exhibits with each page of each exhibit

separately numbered. In the interests of clarity and convenience, the court refers to each exhibit by referencing the exhibit number followed by the exhibit's specific page number. For example, "Defendants' Exhibit 1–2" refers to page 2 of Exhibit 1 submitted in Support of Liaison Group Defendants' Consolidated Motion for Partial Summary Judgment, filed November 5, 1997 (Docket Item Number 344). Similarly, "Plaintiffs' Exhibit 1–2" refers to page 2 of Exhibit 1 submitted in Support of Plaintiffs' Response to Liaison Groups Defendants' Consolidated Motion for Partial Summary Judgment, filed December 24, 1997 (Docket Item Number 408).

actions are thus untimely under § 214(5) as more than three years have passed since the date of first exposure to the alleged toxic substances and the filing of Plaintiffs' complaints in 1995, 1996 and 1997.

As the first exposure rule barred many plaintiffs from commencing actions for injuries caused by latent effects of exposure to hazardous and toxic substances, usually over a long period of time, before discovering their resulting injuries and the causes thereof, in 1986 New York enacted Section 214–c of the New York Civil Practice Law and Rules ("CPLR") which established, for toxic tort cases, special accrual rules and limitations periods effectively providing more time for plaintiffs to file claims seeking damages for injuries and deaths attributed to exposure to such substances. Under § 214–c(2), a three year statute of limitations applies to actions in which recovery is sought "for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances ... computed from the date of the *discovery of the injury* by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier." N.Y. Civ. Prac. L. & R. 214–c (2)(McKinney 1990)(" § 214–c(2)") (emphasis added).

 Here, Plaintiffs seek recovery based on cancers, the earliest of which was discovered in 1963, Defendants' Exhibit 1–3, and the latest of which was discovered in December 1995.[10] Defendants' Exhibit 10–19. An examination of all the relevant exhibits submitted on this motion demonstrates that Plaintiffs' claims are all untimely under § 214–c(2) except the claims of Plaintiffs Harry Basinski and Rose Freier. Specifically, Harry Basinski was diagnosed with throat cancer in February 1992 and prostate cancer in 1994, Defendants' Exhibit 2–6, and Rose Freier was

diagnosed with lung cancer in 1984, liver cancer in 1994 and throat cancer in 1995. Defendants' Exhibit 10–19. Only the claims arising from Mr. Basinski's prostrate cancer which was diagnosed in 1994, and the claims based on Mrs. Freier's liver and throat cancers, respectively discovered in 1994 and 1995, are timely under § 214–c(2) as all such claims were filed within three years of the discovery of their injuries. However, the actions of both Mr. Basinski and Mrs. Freier are untimely under § 214–c(2) insofar as Mr. Basinski's action is predicated on his discovery of throat cancer in 1992, and Mrs. Freier's action is based on her discovery of lung cancer in 1984.

Further, pursuant to N.Y. Civ. Prac. L. & R. § 214–c (4)(McKinney 1990 & Supp. 1997)(" § 214–c(4)"), where a prospective plaintiff discovers his injury but is unaware of the cause until more than three years after discovery of such injury thus rendering the action untimely under § 214–c(2), "an action may be commenced or a claim filed within *one year of such discovery of the cause of the injury*," provided less than five years have elapsed since the discovery of the injury. § 214–c(4) (emphasis added). Additionally, reliance on § 214–c(4) requires that the plaintiff "allege and prove that technical, scientific or medical knowledge and information sufficient to ascertain the cause of his injury had not been discovered, identified, or determined prior to the expiration of the period within which the action or claim would have been authorized ...." § 214–c(4); Practice Commentary to N.Y. Civ. Prac. L. & R. § 214–c(4), p. 634–35 (McKinney 1990) commenting that § 214–c(4) requires a plaintiff to establish "that the state of medical or scientific knowledge was such that causation of his injury could not have been identified within the three-year period prescribed [under § 214–c(2)]."

10. It is assumed only for the purposes of this Discussion that the diagnosis of each Plaintiff's cancer coincided with the discovery of such injury, a fact which has yet to be established by either party.

Here, all Plaintiffs assert that they discovered the cause of their decedents' injuries in 1994. See Exhibits 1–20. Accordingly, the remaining actions are timely only if filed within one year of the discovery of the causes of such injuries and if Plaintiffs establish that the state of medical, technological and scientific knowledge and information was insufficient such that it was not possible to discover the cause of their injuries within time to commence the instant actions within three years from the discovery of their cancers. Also, as 1994 is the asserted date of discovery of the cause of the injuries pertaining to all these actions, the actions commenced with the filing of the *Fiels* complaint on June 17, 1996 or the *Anthony* complaint on January 10, 1997 were not filed within the one year limitations measured from the discovery of the alleged cause of death as required under § 214–c(4), and thus, even if § 9658 applies, are nevertheless time-barred under New York law.[11] Accordingly, § 214–c(4) applies, if at all, only to the personal injury, failure to warn, loss of consortium, and survival and wrongful death actions predicated on the cancers of Grace Astor, Harry Basinski (with regard to his throat cancer diagnosed in 1992), Kevin Batt, Annabel Foisset, Leo Foisset, Raymond Freier, Rose Freier (with regard to her lung cancer diagnosed in 1984), Tab Fuqua, Helen Hancock, Louis Manolis, Donna McKowan, Geraldine Morley, Charlotte Mucha, Franklin Mueller, William Nielsen, Norman Wagner and Mary Ylmar,

**b.** *The FRCD Applies to Personal Injury Actions under New York Law*

 As most of the personal injury, loss of consortium, failure to warn, survival actions and all the wrongful death actions are time-barred under New York law, Plaintiffs assert that the timeliness of their claims are governed by § 9658. It is un-

disputed that this federal enactment neither creates a separate federal cause of action based on toxic torts within its terms nor a uniform statute of limitations for such torts; rather, it provides a uniform accrual date from which the applicable state period of limitation governing the relevant claim is measured. 42 U.S.C. § 9658(a)(4)(B). The FRCD therefore effectively creates federally mandated discovery rule for accrual of state law claims involving releases of hazardous substances that cause or contribute to personal injury. *Pfohl I*, at 522; *Kowalski v. Goodyear Tire and Rubber Co.*, 841 F.Supp. 104 (W.D.N.Y.1994).

Defendants have incorporated by reference their arguments on this same issue in *Pfohl I*. Liaison Group Defendants' Memorandum of Law in Support of Consolidated Motion for Partial Summary Judgment filed November 5, 1997, (Docket Item Number 346) ("Defendants' Memorandum of Law") at 8 (citing Liaison Group Defendants' Memorandum of Law in Support of Consolidated Motion for Partial Summary Judgment filed June 10, 1997) (Docket Item Number 290) ("Defendants' *Pfohl I* Memorandum of Law"), at 25–26. Defendants maintain that the FRCD statute is inapplicable to toxic tort actions brought under New York law as the relevant New York statute of limitations does not provide for a commencement date which is earlier than the FRCD. Under § 214–c(4), if the cause of the injury is not discovered in time for a toxic tort action to be commenced under § 214–c(2), an additional one year limitations period is provided within which to commence such action measured from the earlier of the date the cause of the injury was, or which with reasonable diligence should have been, discovered. Defendants' *Pfohl I* Memorandum of Law at 25.

---

11. Although the court has, as this point, determined that any of the claims asserted in *Fiels* or *Anthony* are time-barred even with the benefit of the FRCD and need not be further discussed, as the instant summary judgment motion is before the court for a Report and Recommendation, in the interest of completeness, such claims are considered in the balance of this Discussion.

Thus, Defendants argue that both § 9658 and § 214–c(4) provide for the same commencement of the limitations period, *i.e.,* the day any Plaintiff discovered, or reasonably should have discovered, the cause of the injuries for which relief is sought. Defendants' *Pfohl I* Memorandum of Law at 25–26.

Defendants, however, overlook the fact that § 214–c(4) is limited to those instances where less than five years have elapsed since the discovery of the injury. Because the § 214–c(4) five year limitation operates to defeat Plaintiffs' claims, it is not an irrelevant issue. As the court found in *Pfohl I,* § 9658 has preempted § 214–c(4) to render it consistent with federal law by overriding the proviso to § 214–c(4) limiting the benefit of the extra year within which to file a toxic tort claim to a maximum period of five years from discovery of the injury. *Pfohl I,* at 530–31. Significantly, the FRCD does not displace § 214–c(4)'s one year limitations period. *Pfohl I,* at 531.

Defendants also argued in support of the prior motion that even if the court finds that the FRCD preempts the specific accrual rules established by § 214–c, as § 214–c applies only to those acts which occurred on or after July 1, 1986, Defendants' *Pfohl I* Memorandum of Law, at 15–16, no Plaintiff for whom the injury was discovered prior to July 1, 1986, and for which injury more than three years had elapsed between the date of exposure and July 1, 1986, can invoke any part of § 214–c, and thus the FRCD, to demonstrate the required timeliness of such claim. Defendants' *Pfohl I* Memorandum of Law, at 15–16.

However, as the court found in *Pfohl I,* although CPLR § 214–c(6) restricts the applicability of the new limitations period under § 214–c, the FRCD preserves all claims brought in a state court after CERCLA's effective date, December 11, 1980, and § 9658 overrides § 214–c(6) as the instant claims were all commenced in either 1995, 1996 or 1997. Accordingly, the instant claims were not time-barred under § 214–c(6),[12] and receive the benefit of the more favorable statute of limitations under § 214–c, as preempted by the § 9658.[13] *Pfohl I* at 531–32.

In the Report and Recommendation issued with respect to the prior motion seeking dismissal of the claims commenced on behalf of decedents who died before suit was commenced, the court considered the fact that most of those Plaintiffs had asserted December 19, 1994 as the correct FRCD. Such assertion was attributed to a meeting held on December 19, 1994 at which Plaintiffs' attorneys shared the results of the Rigle–Sawyer Report with them. Those Plaintiffs thus maintain that December 19, 1994 is the first date that adequate information was available for any Plaintiff to learn the cause of his cancer. The court found the date that Plaintiffs' admission that sufficient information was available on December 19, 1994 for any one Plaintiff to "know" the cause of his injury indicates that sufficient information was available on December 19, 1994 for all Plaintiffs to know the cause of their injuries. *Pfohl I* at 531. As such, December 19, 1994 was the latest possible FRCD for the accrual of any claim whose timeliness

12. The FRCD by its terms preempts § 214–c(6) from being applied to disallow a toxic tort claim where more than three years have run from the time a plaintiff knew or should have discovered the injury prior to 1986 as § 214–c(6) does not apply where the cause of the injury is discovered after the FRCD's effective date of December 11, 1980.

13. The fact that the FRCD allows some toxic tort claims to be pursued if filed after December 11, 1980 does not imply that all such claims based on pre–1980 exposures remain viable. Thus, any toxic tort claims which may have been litigated and judicially determined to be time-barred could not be relitigated under the FRCD as such claims would necessarily have been based on the plaintiffs' awareness of both the asserted injury and its cause. These claims would by definition be excluded from the FRCD.

depends on the FRCD. *Id.* That finding applies with equal force to the instant claims.

### c. *Survival and Wrongful Death Actions*

As stated, six Plaintiffs who were alive when these actions were commenced have since died, namely, Ellen Basinski, Annabel Foisset, Leo Foisset, Rose Freier, Helen Hancock and Louis Manolis. The actions of all those deceased Plaintiffs, except for Mrs. Basinski whose action was limited to loss of consortium based on her husband's cancer, are now maintained as survival actions by representatives of the decedents' estates who have also added wrongful death claims. To date, there has been no substitution of a representative of Mrs. Basinski's estate to continue her claim.

■ An essential element of both survival and wrongful death claims is that the decedent have died with a viable cause of action against the infliction of the injury which caused the death. N.Y. Est. Powers & Trust Law §§ 11–3.2 (survival actions) and 5–4 (wrongful death). Unlike *Pfohl I,* in which the court was required to consider whether § 9658 applied to survival and wrongful death actions where the injured persons died before it was possible to know the cause of their injuries, no similar analysis is required here as these actions were commenced by Plaintiffs who acquired such knowledge before their deaths. Accordingly, the timeliness of the instant survival and wrongful death actions is based solely on whether the newly deceased Plaintiffs' actions were timely filed, and thus viable, before their deaths.

### 2. *The Timeliness of Plaintiffs' Claims Given the Benefit of the FRCD*

Defendants assert that summary judgment should be granted as to the instant claims as sufficient public information existed such that Plaintiffs, had they fulfilled their obligation to exercise due diligence, would have discovered the cause of their injuries prior to 1992. Defendants' Memorandum of Law. Plaintiffs argue that summary judgment should be denied as genuine issues of material fact exist as to when each Plaintiff knew or should reasonably have known that their respective cancers were caused by the Landfill, particularly in light of the number of possible causes of cancer, the fact that no Plaintiff ever received medical or scientific advice that his cancer may be attributed to the Landfill, as well as the competing policies of statutes of limitations and the discovery rule. Plaintiffs' Memorandum of Law at 14. Defendants reply that Plaintiffs have failed to demonstrate that they could not have determined the cause of their injuries prior to 1992. Defendants' Reply Memorandum of Law at 10.

As discussed, the timeliness of the claims pertaining to Harry Basinski based on his prostate cancer as well as to Rose Freier based on her liver and throat cancers do not depend on § 9658 as they were filed within three years of the date of their discovery and thus are timely under § 214–c(2). Further, all Plaintiffs' remaining claims filed in 1996 and 1997 are untimely even with the benefit of § 9658 as they were filed more than three years after discovery of the relevant cancers and more than one year after the asserted FRCD of December 1994. The court thus must consider whether the remaining personal injury, failure to warn, loss of consortium, and survival and wrongful death actions predicated on the cancers of Grace Astor, Harry Basinski (with regard to his throat cancer diagnosed in 1992), Kevin Batt, Annabel Foisset, Leo Foisset, Raymond Freier, Rose Freier (with regard to her lung cancer diagnosed in 1984), Tab Fuqua, Helen Hancock, Louis Manolis, Donna McKowan, Geraldine Morley, Charlotte Mucha, Franklin Mueller, William Nielsen, Norman Wagner and Mary Ylmar, are timely under § 214–c(4) as filed within one year of the date the cause of their respective cancers should reasonably have been discovered.

### a. *Burden of Proof*

Preliminarily, the court considers Plaintiffs' argument that Defendants seek to hold Plaintiffs to a higher standard of proof than is required on a motion for summary judgment. Plaintiffs' Memorandum of Law at 8. Specifically, Defendants have argued that to defeat summary judgment on a statute of limitations issue, Plaintiffs must establish by competent evidence that their claims were timely commenced as they neither knew, nor could reasonably have known, more than three years before the first action was commenced on January 10, 1995 (*Freier*), that their injuries might be caused by exposure to toxic substances deposited into the Landfill.[14] Defendants' Memorandum of Law at 9–10.

 Courts are not permitted to weigh evidence in deciding motions for summary judgment, *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir.1995), as the purpose of summary judgment is to identify the existence of a genuine disputed issue of materiality for trial, *Gallo v. Prudential Residential Services, Limited Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994), so as to exclude from going to trial issues which cannot be substantiated. *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir.1997).

 Where however, as here, the nonmoving party (Plaintiffs) bears the ultimate burden of proof on a dispositive issue, Fed.R.Civ.P. 56(e) requires the nonmoving party to go beyond the pleadings and, by affidavits, depositions, answers to interrogatories, or admissions on file, "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56). The Second Circuit has interpreted Rule 56 as

requiring that, to defeat summary judgment, the nonmoving party must come forward with evidence sufficient to support a jury verdict in its favor once a party moving for summary judgment has made a properly supported showing to suggest the absence of any genuine issue as to all material fact. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir.1995).

Accordingly, to survive summary judgment, as Plaintiffs rely on the FRCD to push forward the accrual of § 214–c(4), Plaintiffs must show, either by evidence admissible at trial or reducible to such evidence, that a material issue of fact exists as to the earliest time when they should have reasonably discovered the cause of their alleged injury making their claims timely under § 214–c(4) as modified by § 9658. *ABB Industrial Systems, Inc. v. Prime Technology, Inc.*, 120 F.3d 351, 357 (2d Cir.1997); *Celotex, supra*, at 323, 106 S.Ct. 2548.

### b. *Summary Judgment May Be Granted on Statute of Limitations Grounds*

 Plaintiffs assert that when the Plaintiffs knew or should have known the cause of their injuries is not a proper question to be resolved on summary judgment. Plaintiffs' Memorandum of Law at 9–10. However, contrary to that assertion, courts in this circuit have decided such issues on summary judgment. *See, e.g., BellSouth Telecommunications, Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996) (dismissing claim on summary judgment where evidence established that it was time-barred under Connecticut discovery statute); *Griffin v. Garratt–Callahan Co.*, 74 F.3d 36, 39 (2d Cir.1996) (holding on summary judgment that claims time-barred under § 214–c(2) because the

---

**14.** Although Defendants maintain that it is the one year limitations period under § 214–c(4) that is relevant to these claims, Defendants, in an abundance of caution should the court decide that the three year limitations period under § 214–c(2) is applicable, nevertheless argue that the cause of Plaintiffs' cancers could have been determined more than three years before the first action was filed. Defendants' Reply Memorandum of Law at 2 n. 3.

evidence submitted established that the plaintiff knew or reasonably should have known the cause of his injuries earlier than asserted); *Humphreys v. Humphreys,* 949 F.Supp. 1014, 1019–20 (E.D.N.Y.1997) (finding on summary judgment that claims were time-barred because plaintiff should have discovered cause of her injuries earlier). Accordingly, the court may properly consider on Defendants' motion when Plaintiffs knew, or reasonably should have known, the cause of their cancers.

### c. *Commencement of the Statute of Limitations under § 214–c(4) as Preempted by § 9658*

Plaintiffs maintain that when the relevant period of limitations commenced running must be determined based on a number of factors. For example, Plaintiffs assert the court must take into account the belief that cancer has numerous causes, whether any Plaintiff received medical or scientific advice regarding the cause of his or her cancer, whether such advice allayed any possible suspicion of the cancer's non-organic etiology, and the purposes of discovery based accrual mechanisms for statutes of limitations as they relate to toxic torts. Plaintiffs' Memorandum of Law at 14. Defendants contend that a reasonable suspicion that an injury may have been caused by exposure to toxic or hazardous substances is sufficient to trigger a rule of limitations that is predicated on knowledge of a fact or event. Defendants' Memorandum of Law at 11. Defendants further maintain that courts have imposed on injured plaintiffs a duty to make a reasonable inquiry as to the cause of their injuries within an applicable statute of limitations period or place their claims at risk of dismissal. Defendants' Memorandum of Law at 11–12. Plaintiffs, however, argue that any attempt to discover the cause of their injuries would have been fruitless given their lack of formal education and sophistication in medical, technological and scientific fields. Plaintiffs' Memorandum of Law at 12–13.

Plaintiffs define the requisite "pertinent inquiry" to determine the correct FRCD as "[w]hat would a reasonable person *in similar circumstances* have known with respect to the cause of his or her cancers." Plaintiffs' Memorandum of Law at 13 (emphasis added). However, according to Plaintiffs, such "similar circumstances" include the individual Plaintiffs' states of mind, education and scientific sophistication, *id.*, and thereby injects a subjective element not present in the definition of the FRCD. As stated, the FRCD is defined as "the date the plaintiff knows (or reasonably should have known) that the personal injury ... w[as] caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4)(A). A plain reading of 42 U.S.C. § 9658(b)(4)(A) demonstrates that when a plaintiff knows or reasonably should know the cause of his injury is both subjective, i.e., the earlier of a plaintiff's actual knowledge, and objective based on the reasonable person standard. Accordingly, Plaintiffs' argument that their lack of scientific sophistication and formal education has excused them from acting with due diligence to discover the cause of their injuries fails as such factors depend, contrary to the plain meaning of the FRCD, on only the subjective knowledge of each plaintiff, and excludes the alternative objective standard as provided by the FRCD.

Relevant caselaw holds that where the timeliness of a cause of action is measured by the date of discovery of the plaintiff's cause of injury, the plaintiff has a duty upon learning he has been injured to investigate for the purpose of determining the cause of the asserted injury. In *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), the Supreme Court held, in a Federal Tort Claims Act ("the FTCA") action, that if sufficient information exists in the community such that the plaintiff, armed with the knowledge of his injury could, upon inquiring as to the cause of such injury, have found sufficient information to commence

suit, "[t]o excuse him from promptly doing so by postponing the accrual date of his claim would undermine the purpose of the limitations statute, which is to require the reasonably diligent presentation of tort claims ...." *Kubrick, supra*, at 123, 100 S.Ct. 352. Significantly, in *Kubrick,* the Supreme Court expected its interpretation of the accrual date of a tort under the FTCA would be relied on in reaching future determinations regarding the timeliness of other claims based on similar rules. *Kubrick, supra*, at 124, 100 S.Ct. 352.

*Kubrick* has been interpreted as requiring a plaintiff to investigate the cause of his injury upon its discovery where the accrual of a cause of action is based on discovery of the cause of the injury. *Fries v. Chicago v. Northwestern Transp. Co.,* 909 F.2d 1092, 1095–96 (7th Cir.1990) ("a plaintiff must act diligently and cannot wait until the injury is actually made known to him by some unplanned incident .... Rather, *upon experiencing symptoms* a plaintiff has a duty to investigate both the injury any suspect cause.") (emphasis added) (citing *Kubrick, supra*, at 123, 100 S.Ct. 352).

In *Kronisch v. United States,* 150 F.3d 112 (2d Cir.1998), the Second Circuit upheld summary judgment against a plaintiff who failed to commence an action under the FTCA after more than six years had elapsed since he formed the belief that his injury was caused by his exposure to LSD in the 1950's as part of a clandestine government approved experiment. The court stated that while neither "a mere hunch, hint, suspicion or rumor of a claim" is sufficient for a cause of action to accrue, they "do give rise to a *duty to inquire* into the possible existence of a claim in the exercise of due diligence." *Kronisch, supra*, at 121 (emphasis added) (citing *Hobson v. Wilson,* 737 F.2d 1, 35 & n. 107) (emphasis added). The court held that had the plaintiff exercised reasonable diligence by making relevant inquiries, he would have discovered the cause of his injuries soon enough to timely commence an action. *Kronisch, supra*, at 124.

 `Accordingly, the court finds that Plaintiffs were obligated, upon discovering that they had cancer, to investigate to determine the cause of such injuries. The court also finds that sufficient information was available prior to 1992 such that had Plaintiffs fulfilled their duty to inquire upon discovering their injuries as to the possible existence of a claim based on their cancers, Plaintiffs would have been able to file an action more than three years prior to the filing of the instant actions.

In support of their motion, Defendants have submitted a plethora of exhibits consisting of government and media reports as well as other publicly available information pertaining to at least three citizen groups concerned with the effect of the Landfill on neighboring areas and residents, indicating that Plaintiffs should have developed a reasonable suspicion as to the cause of their injuries prior to the end of 1991.[15] These exhibits establish that a highly publicized controversy existed within the local community over whether the Landfill posed a threat to the health and safety of those who resided or worked in the vicinity of the Landfill. The sheer volume of exhibits makes it impractical to comment on each item of information as

**15.** As a threshold matter, in accordance with the court's finding in its Decision and Order issued simultaneously with this Report and Recommendation regarding the motions to strike, the court has limited its consideration of the media and unauthenticated government reports, relied upon by Defendants, to the fact that such articles containing the relevant information were published rather than for the truth of the matter reported therein. *See* Decision and Order dated February 12, 1999 at 10–11 (finding that media and unauthenticated government reports submitted as exhibits to Defendants' motion for summary judgment would be considered only insofar as they helped explain the basis of Defendants' motion rather than for the truth of the matter asserted or to establish that no issue of material fact existed).

the exhibits comprise, in total, over 10,000 pages.

After review of the exhibits, the court finds it is more than reasonable that, given the volume of information available to the public prior to 1992, Plaintiffs could be expected to reasonably suspect the cause of their cancers before the end of 1991. The vast number of media and government reports Defendants submitted in support of summary judgment were all available prior to the end of 1991. For example, a draft report entitled Emergency Task Force on Hazardous Wastes issued in 1979 indicates concerns existed regarding "the migration of leachate which may contain chlorinated benzenes and the resulting contamination of groundwater." Defendants' Exhibit 26–4. According to that report, industrial wastes known to have been deposited into the Landfill included pine tar pitch, scrap glass and emery, waste paints and thinners, waste cutting oils, silicon, metal, waste solvents, rouge, phenol tar containing chlorinated benzenes, oil, and capacitors with PCBs. *Id.*

The First Annual Report of Hazardous Waste Disposal Sites in New York State, a joint report by the New York State Department of Environmental Conservation ("DEC") and the New York State Department of Health ("DOH") issued in June 1989, indicates that the presence of industrial wastes including waste oils, paint, thinners, pine tar pitch, cellulose, rubber, scrap metal, drums and phenol tars in the Landfill was confirmed. Defendants' Exhibit 27–17 to 27–21.

A DEC report issued in March 1980 indicates that available information demonstrated that the Landfill had received substantial quantities of waste between 1950 and 1970, some of which was of an industrial origin and that the effect of such wastes on surface and ground waters was unknown, although leachate emanating from the site indicated the potential for "serious surface water contamination" as well as possible ground water contamination and that further study of the site was

warranted. Defendants' Exhibit 28–1 to 28–19.

A site inspection prepared in 1982 to "score" the Landfill for potential placement on the Federal Superfund National Priorities List concluded that the presence of toxic chemicals detected at the site posed a hazard to human health from direct contact with the site. Defendants' Exhibit 29–2 to 29–14.

In an internal office memorandum to Peter Buechi with the County of Erie Department of Environment & Planning, Division of Environmental Control, Donald Campbell, Senior Environmental Quality Engineer with the Division of Environmental Control, reported that leachate from the Landfill was entering the stream which flows north of the Landfill and into a brush wetland west of the Landfill. Defendants' Exhibit 30–1. The DEC and DOH December 1983 Inactive Hazardous Waste Disposal Sites in New York State Annual Report refers to the fact that the Landfill was classified by the DEC as posing a "[s]ignificant threat to the public health or environment—action required." Defendants' Exhibit 30–10 to 11.

Craig Fiels, son of Plaintiff Robert Fiels, prepared his own report on the Landfill in 1985 based on information obtained through FOIA requests. Defendants' Exhibit 33–2 to 33–4 and 33–7 to 33–52. Fiels concluded that "[a]lthough the available data are not in total agreement as to the severity of the hazard posed by the dump, there seems to be no doubt that a variety of toxic chemicals are not only present at the site but are also migrating offsite." Defendants' Exhibit 33–43.

Warning signs were posted around the Landfill in 1986. Defendants' Exhibit 33–78. In 1987, the Landfill was formally designated as a State Superfund Site and a remedial investigation/feasibility study was prepared. Defendants' Exhibit 34–1 to 34–10.

In 1988 a Health and Safety Plan for the Pfohl Brothers Landfill was prepared for the DEC. Defendants' Exhibit 35–7 to 35–60. That report noted that major contaminants such as benzene, chlorobenzene, chrysene, pyrene, and arsenic had been detected in the Landfill. Defendants' Exhibit 35–19. Identified as potential routes of exposure were "respiratory exposure from both gaseous vapors and particulates, dermal from both particulates and vapors generated during the soil sampling activities, and adsoprtion during the ground water, soil and sediment, leachate seep, surface water and surface waste sampling." Defendants' Exhibit 35–19.

A letter written by Thomas Cline, a plaintiff in the parallel state court actions and a founding member of the Pfohl Area Homeowners and Residents Coalition, one of the citizen action committees formed to investigate health concerns relative to the Landfill, to the editor of The Buffalo News appeared in the February 2, 1991 edition of that local newspaper of general circulation. Defendants' Exhibit 38–9. According to that letter, Mr. Cline believed that toxins and chemicals were migrating off the Landfill causing property values to decline and dissuading further construction in the vicinity of the Landfill. *Id.*

A report was released by the DOH on February 8, 1991 based on water samples collected on October 1990 from sump pumps located in the basements of six residential dwellings in the vicinity of the Landfill. Defendants' Exhibit 38–40 to 38–52. The purpose of that study was to determine "if contaminants associated with the groundwater on-site have migrated off-site to homes and in a manner that could result in human exposure." Defendants' Exhibit 38–40. It was anticipated that such data would be used for "further site characterization" and to select "remedial alternatives." *Id.* The report concluded that the levels of hazardous and toxic substances detected in the residences was not sufficient to threaten human health. Defendants' Exhibit 38–43.

A cancer incidence study issued in March 1991 by the Cancer Surveillance Program, Bureau of Cancer Epidemiology, New York State Department of Health reported "[w]ithin specific anatomic sites of cancer, a significant excess of cases was observed among males for cases of prostate cancer (79 cases observed, 49 cases expected) and among females for cancers of the breast (130 cases observed, 105 cases expected) .... no other cancer site among males or females was found to demonstrate a significant excess or deficit of cases." Defendants Exhibit 38–105 to 38–123.

The findings contained in the DOH epidemiology study were shared with the public at a meeting held on March 25, 1991. Defendants' Exhibit 38–127. Notices of that meeting were published in The Buffalo News and The North Cheektowaga Metro Community News. Defendants' Exhibit 38–125 & 126. The minutes of that meeting indicate that those in attendance did not believe much of the information that they had received regarding whether the Landfill posed any threat to their physical safety, and that they were aware that the toxic and hazardous substances may have migrated off the site of the Landfill. Defendants' Exhibit 38–128 to 38–137.

A Responsiveness Summary for Remedial Investigation Report was issued by the DEC on April 12, 1991 as follow-up to a public meeting held on March 7, 1991 at Erie County Community College to discuss the results of the remedial investigation completed to date. Defendants' Exhibit 38–68 to 38–94. That report indicates that the issue of whether the Landfill posed any threat to the health and safety of nearby residents was a key topic of debate and inquiry.

Another epidemiology study was released by the DOH in November 1991 as follow up to the earlier March 1991 DOH cancer incidence study. The November 1991 DOH study indicates that deposits

into the Landfill between 1932 and 1969 included household wastes, chemical wastes, phenol tars, waste solvents, paints, thinners, pine tar pitch, rubber and scrap metals. Defendants' Exhibit 38–192 to 38–196. The report noted that an investigation by the New York State Department of Environmental Conservation ("the DEC") began in 1983 and subsequent investigations in 1989 and 1990 detected various contaminants at the Landfill including metals (barium, iron, lead and nickel), polychlorinated biphenyls (PCBs), polychlorinated-dibenzo-*p*-dioxins ("dioxins") polychlorinated dibenzofurans ("furans") and other organic chemicals. *Id.* Areas of elevated radiation levels were also detected within the Landfill. *Id.* The report states that it was "conducted in response to concerns among area residents about potential increased health risks due to contamination from the Pfohl Brothers Landfill." *Id.* The report concluded that the higher than anticipated incidence of breast cancers previously observed in March 1991 by the DOH in the Landfill vicinity was attributed to personal risk factors, Defendants Exhibit 38–194, and no statistically significant "clustering" was observed as to previously reported cases of prostate cancer or newly diagnosed leukemia, lymphoma or female lung cancers. Defendants' Exhibit 38–196.

At a public hearing held on December 11, 1991, before DEC Hearing Office Peter J. Buechi, Regional Engineer for Solid and Hazardous Waste, Ms. Weiss, Chairperson of the Pfohl Brothers Landfill Cleanup Committee ("the PBLCC"), a citizen action group whose intended purpose was to monitor the cleanup of the Landfill, spoke. Defendants' Exhibit 38–210 to 38–251. Ms. Weiss declared that as the DEC had acknowledged to the PBLCC that "the actual volumes of materials and areas to be excavated are not clearly defined . . . . [the PBLCC] has the perception that the depth of contamination is still unknown." Defendants' Exhibit 38–216. Ms. Weiss then stated that "people living near or adjacent to this site should be temporarily or permanently relocated." *Id.*

Although Plaintiffs base their failure to determine the cause of their cancers earlier than December 1994 partly on their lack of formal education, no Plaintiff has maintained that he or she is illiterate or otherwise unable to understand such reports. To the contrary, many of the Plaintiffs admitted in response to Defendants' interrogatories that they first learned through media reports that exposure to hazardous or toxic substances could cause cancer. *See* Defendants' Exhibits 1–9, 2–12, 3–15, 4–14, 5–15, 7–12, 9–14, 10–26, 11–14, 13–13, 14–12, 15–17, 16–12 and 20–10. For example, in response to Defendants' interrogatories, Plaintiff Michael Lamancuso indicated that he first learned of a causal connection between exposure to hazardous and toxic substances and cancer in high school, Defendants' Exhibit 13–13, while Defendant Norman Wagner stated that he first acquired such knowledge when he attended asbestos removal classes *ten years earlier.* Defendants' Exhibit 19–14. Plaintiff Harry Basinski stated in response to Defendants' Interrogatory No. 10 that it was through media coverage of the Love Canal case, another major environmental case in Western New York, that he first learned that exposure to hazardous or toxic substances might cause cancer. Defendants' Exhibit 2–12.

The fact that other similar lawsuits had been commenced in the Western District of New York also should have alerted Plaintiffs to the cause of their injuries. Specifically, Plaintiffs admitted familiarity with the Love Canal case that received extensive coverage in the national media and was one of the major justifications for the SARA legislation which enacted the FRCD in 1986. Further, a legal action to recover injuries to real property brought by owners of property located near the Landfill allegedly caused by latent effects of exposure to substances in the Landfill was held time-barred under § 214–c(2) as more than three years before commencing

such suit the plaintiffs had applied for reductions of their property tax assessments based on exposure to the Landfill. *Pfohl v. Amax, Inc.*, 222 A.D.2d 1068, 635 N.Y.S.2d 880, 881 (App.Div. 4th Dep't. 1995). Thomas Cline testified at his deposition on September 3, 1997 that he and Plaintiff Robert Fiels has previously contacted another attorney, Richard Lippes, Esq. in 1990 to investigate the possibility of commencing legal action similar to their pending actions. Defendants' Exhibit 39–2 and 39–9.

Plaintiffs maintain that despite the existence of publicly available information indicating that the Landfill may pose a threat to residents and workers in the vicinity, numerous other publicly available media, medical and scientific reports allayed any such suspicions they may have had. Plaintiffs' Memorandum of Law at 2425. At the very least, Plaintiffs maintain that the reassurances created by the reports issued by the New York State Departments of Environmental Conservation and Health, state agencies directly concerned with the potential damage to the environment and public health posed by the Landfill, establish factual issues going to Plaintiffs' discovery of cause of their injuries as Plaintiffs were entitled to rely on such reports. Plaintiffs' Memorandum of Law at 25.

Despite the existence of such "reassuring reports" there is, however, considerable evidence that the matter of whether the Landfill posed a threat to their health remained unresolved. *See, e.g.,* Plaintiffs' Exhibits 34–47 to 34–53; 34–54 to 34–73; 34–114 to 34–120 and 34–185 to 34–195. It is also significant that no Plaintiff has pointed to any evidence indicating that he or she relied on these reports. To the contrary, Plaintiffs admit that they never asked any physician what caused their cancers nor mentioned their proximity to the Landfill. See Defendants' Exhibits 49–68. Further, no reasonable juror could infer anything from the statements made by Ms. Weiss at the public hearing before DEC Hearing Officer Buechi on December 11, 1991, other than that relocation of persons who resided in the vicinity of the Landfill was requested based on a belief that continued exposure to toxins from the Landfill posed a serious risk to their health.

Given the abundance of media coverage dedicated to the Landfill prior to 1992 along with Plaintiffs' admissions in response to interrogatories that they acquired the requisite knowledge to develop a reasonable suspicion as to the cause of their cancers through media reports, no reasonable trier of fact could find that Plaintiffs, had they been reasonably diligent in inquiring as to the cause of their cancers upon being diagnosed, would not have discovered sufficient information to develop a reasonable suspicion as to the cause of such injuries prior to the end of 1991. Furthermore, as discussed below, had Plaintiffs exercised their duty to inquire as to the cause of their cancers, their efforts would not have been fruitless as sufficient scientific, technological and medical information existed not later than by the end of 1991 to permit Plaintiffs to discover the cause of their injuries.

### d. *Plaintiffs Have Failed to Establish that It Was Not Possible, Had They Exercised Due Diligence, to Discover the Cause of Their Cancers Prior to 1992*

Plaintiffs maintain that they could not be required to further investigate a mere suspicion as to the cause of their cancers where such investigation would have been fruitless. Defendants' Memorandum of Law at 17. Defendants point out in their reply, that as after 1991 there were no new government studies, releases of previously undisclosed information, nor any medical or scientific breakthroughs on which Plaintiffs rely as having permitted them to discover the cause of their cancers, Plaintiffs have failed to establish the existence of a material issue of fact that such cause could not have been determined prior to the end of 1991. Defendants' Reply Memorandum

of Law at 10–11. Plaintiffs have not responded to this argument.

■■ The timeliness of Plaintiffs' claims under § 214–c(4), as preempted by § 9658, is based on an objective determination as to when sufficient information was available such that Plaintiffs, with the knowledge of their cancers and the fact that exposure to hazardous and toxic substances can cause cancer, and acting with a reasonable amount of diligence, could have discovered the cause of their cancers, at least to the same degree of knowledge they assertedly possessed as of the time they finally chose to file. By its own terms, § 214–c(4) requires that "the plaintiff or claimant shall be required to allege and prove that technical, scientific or medical knowledge and information sufficient to ascertain the cause of his injury had not been discovered, identified or determined prior to the expiration of the period within which the action or claim would have been authorized . . . ." § 214–c(4). Section 214–c(4), however, does not require that the allegedly injured party acquire detailed scientific proof of the source of the injury before commencing suit. *Mancuso v. Consolidated Edison Company of New York, Inc.*, 905 F.Supp. 1251, 1262 (S.D.N.Y. 1995). Nor may an injured party delay triggering the limitations period by refusing to conduct scientific tests to determine the cause of the alleged injury. *Mancuso, supra*, at 1262. Instead, the additional limitations period provided by § 214–c(4) is intended to benefit only those injured parties who could not, despite the exercise of reasonable diligence upon diagnosis, have discovered the cause of their injuries earlier because the scientific, medical or technological information needed to make such determination was not available. *Mancuso, supra*, at 1261.

■■ As the court has found that § 9658 preempts § 214–c(4) only to override, in toxic tort cases to which it is applicable, the temporal restriction as to when an action may be timely commenced based on the discovery of the cause of the injury, § 9658 has not eliminated the pleading and proof requirement under § 214–c(4) regarding a plaintiff's objections concerning the state of technology, science and medicine. Accordingly, to avoid summary judgment, Plaintiffs must demonstrate there exists a genuine issue of disputed fact that the state of science, technology and medicine one year prior to the filing of the instant actions rendered the cause of their cancers not reasonably discoverable.

Plaintiffs maintain that they were not required to investigate the cause of their cancers before December 1994 when the preliminary results of the Pfohl environmental health study conducted by Plaintiffs' experts, Drs. Rigle and Sawyer ("the Rigle–Sawyer Report") were first shared at a meeting at which many of the Plaintiffs as well as Plaintiffs' legal counsel were present. Plaintiffs' Memorandum of Law at 21 (citing Affidavit of Laura J. Van Pelt, Esq., in Support of Plaintiffs' Response to Liaison Group Defendants' Consolidated Motion for Partial Summary Judgment filed December 24, 1997 (Docket Item Number 414), at ¶¶ 10–26). According to Plaintiffs, the idea that the cause of their cancers may be attribute to the Landfill "had not even crossed their minds prior to 1994." *Id.* Defendants argue that despite Plaintiffs' claim that it was reasonable for them not to investigate the cause of their cancers prior to December 1994 when their attorneys and experts informed them of the cause, Plaintiffs have failed to demonstrate why they could not have obtained such information at an earlier date. Defendants' Reply Memorandum of Law at 10.[16]

16. Although both parties refer to the Rigle–Sawyer Report in support of their arguments on the summary judgment motion, the Rigle–Sawyer Report has not been made part of the record. However, the court notes that drafts

of the Rigle–Sawyer Report were submitted to the court in connection with an earlier motion for a protective order. To ensure that the record is complete for further review, the

Significantly, Plaintiffs have submitted no evidence or any explanation as required under § 214–c(4) why it was not possible to obtain a "scientific" opinion similar to the one contained in the Rigle–Sawyer Report on which they rely in support of their contention that the FRCD occurred no earlier than December 1994, substantially prior to that date. The March and November 1991 DOH cancer incidence reports as well as the Rigle–Sawyer Report all compare the incidence of specific types of cancer diagnosed in persons who lived or worked near the Landfill with the expected incidence of similar types of cancer occurring within the general population. It is undisputed that the conclusions reached by the DOH reports issued in March and November 1991 and the Rigle–Sawyer Report differ as to whether any elevation in the incidence of any particular type of cancers occurring among those who lived or worked near the Landfill could be attributed to the hazardous and toxic substances known to have been deposited into the Landfill. A review of the February 1991 report indicates that the DOH used different methods than Drs. Rigle and Sawyer to obtain specimens for the chemical analysis contained in those reports. Plaintiffs do not, however, contend that the findings contained in the Rigle–Sawyer Report are based on scientific testing techniques or statistical analysis that could not have been performed earlier than 1994. Nor do Plaintiffs deny that the Rigle–Sawyer Report does anything other than draw correlations between the incidence of reported cancers in the vicinity of the Landfill and the type of hazardous and toxic substances detected in the Landfill. In any event, if the Rigle–Sawyer Report is based on technical, scientific or medical knowledge developed after the dates of the earlier DOH study, Plaintiffs have not, as

required by Fed.R.Civ.P. 56(e), demonstrated it.[17]

■ Plaintiffs argue that granting summary judgment would be unfair and defeat the remedial purposes of § 9658. Plaintiffs' Memorandum of Law at 14. The purpose of any statute of limitations is to fairly balance a claimant's right to access to the courts with a defendant's interest in repose. *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1074 (2d Cir.1993) ("Statutes of limitations are designed to ensure fairness to defendants and to prevent surprises brought about by the attempt to breathe life into causes that have lain dormant for so long that proof, witnesses and memories all, have disappeared."). As such, there is nothing unfair in imposing the sanction of dismissal even in a toxic tort case based on latent harm where a plaintiff has been laggard in pursuing his claim. No so-called "discovery rule" for accrual of toxic tort action requires or permits a prospective plaintiff to develop sufficient evidence of causality before accrual may occur. *See e.g., Blanco, supra,* (applying § 214–c(2) based on symptoms of carpal tunnel syndrome). For a plaintiff to argue, as Plaintiffs apparently do, Plaintiffs' Memorandum of Law at 14–18, that under § 9658 a toxic tort statute of limitations does not accrue until a plaintiff has sufficient evidence to meet his burden of proof at trial, confuses the notion of accrual for statute of limitations purposes with the requirements of proof at trial. If Plaintiffs were correct, accrual might be extended indefinitely as a plaintiff would argue he was entitled to await scientific or medical certainty as to the issue of causation before filing a claim. The FRCD as enacted by § 9658 permits no such refuge; rather, it places a fair burden on a plaintiff to diligently investigate a possible claim. Section 214–c(4) permits a plaintiff to delay accrual, but

court has directed that copies of those draft reports be filed as court exhibits.

**17.** For example, according to the Rigle–Sawyer Report, the DOH study "provided less

than optimal scientific data" because "standard and customary epidemiological methods were not exercised." Rigle–Sawyer Draft Report Section A, p. 2.

only if the plaintiff, at his risk, is able to show that he could not, consistent with the status of scientific, technological or medical knowledge, have reasonably known he could do so earlier. Plaintiffs have, for the reasons discussed, failed to make such a showing here.

Accordingly, Plaintiffs' failure to support their contention that it would have been fruitless to investigate the cause of their cancers earlier as such determination was not possible based on the state of technology, science and medicine is fatal to their claims on the instant summary judgment motion.[18]

### 3. Constitutionality of 42 U.S.C. § 9658

Defendants have also incorporated by reference to their Memorandum of Law submitted in support of their previous motion for summary judgment the same challenge to the constitutionality of the FRCD arguing it represents an exercise of congressional legislative power beyond the limits of the Commerce Clause and also violates the Tenth Amendment. Defendants' Memorandum of Law, at 8, citing Defendants' *Pfohl I* Memorandum of Law at 27. Plaintiffs assert that the FRCD was validly enacted pursuant to Congress' authority under the Commerce Clause and does not invade the sovereignty of the states. Plaintiffs' Memorandum of Law at 3–6.

The only new argument advanced by Defendants in support of their challenge to § 9658's constitutionality is an assertion that the Second Circuit recently held in *ABB Industrial Systems, Inc. v. Prime Technology, Inc.*, 120 F.3d 351 (2d Cir. 1997) that § 9658 violates the Tenth Amendment. Defendants' Memorandum

of Law at 8. In support of their argument, Defendants specifically refer to a footnote in that case in which the court noted that § 9658 "appears to purport to change state law, and is therefore of questionable constitutionality" under *Printz v. United States,* 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) and *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Defendants' *Pfohl I* Memorandum of Law at 8 (citing *ABB Industrial Systems, Inc., supra,* at 360 n. 5). Defendants thus maintain that by questioning the constitutionality of the FRCD, the Second Circuit also found it unconstitutional. Defendants, in reply to Plaintiffs' response, cite *Seneca Meadows Inc. v. ECI Liquidating, Inc.,* 983 F.Supp. 360 (W.D.N.Y.1997), decided after the instant motion was filed, in further support of their motion. Liaison Group Defendants' Reply Memorandum of Law in Support of Consolidated Motion for Partial Summary Judgment filed January 20, 1998 (Docket Item Number 442) ("Defendants' Reply Memorandum of Law") at 1 n. 1.

However, a plain reading of *ABB Industrial Systems, Inc., supra,* reveals that, contrary to Defendants' assertion, the Second Circuit did not determine that § 9658 was unconstitutional and, in fact, stated "[w]e will not address the issue of the constitutionality of section 9658 today." *ABB Industrial Systems, Inc., supra,* at 360 n. 5. Defendants' assertion that by questioning the constitutionality of § 9658 but declining to address that issue the Second Circuit held § 9658 is unconstitutional is thus a non sequitur. Nor does *Seneca Meadows, supra,* support Defendants' argument as there, Judge Larimer, noting that the Second Circuit had questioned the constitutionality of § 9658, stat-

18. The court notes that none of the complaints filed in this action, including both original and amended complaints as well as the more recently filed complaint in the *Minier* action allege, as required under § 214–c(4), that the Plaintiffs were prevented from discovering the cause of the cancers earlier because the technical, scientific or medical knowledge or information required to ascertain such cause had yet to be discovered, identified or determined prior to the time which would have permitted the instant claims to be timely filed under § 214–c(2). However, Defendants have not moved to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim, and, as such, the court's finding that these claims are time-barred is not based on such failure.

ed that as that question also was not before the district court, it was unnecessary to address it. *Seneca Meadows, supra,* at 363 n. 1.

Further, in accordance with *Pfohl I,* the court finds that § 9658 does not violate either the commerce clause or the Tenth Amendment and, as such, is constitutional. *Pfohl I* at 539–46.

### 4. *Derivative Loss of Consortium Claims*

Defendants maintain that Plaintiffs' loss of consortium claims[19] must be dismissed if the underlying action is dismissed. Defendants' Memorandum of Law, at 64. Defendants further maintain that Marlene Lamancuso's loss of consortium claim which is derivative of her husband Michael Lamancuso's claims should be dismissed in light of *Consorti v. Owens–Corning Fiberglas Corp.,* 86 N.Y.2d 449, 634 N.Y.S.2d 18, 657 N.E.2d 1301 (1995) where the court held that no action for loss of consortium may be maintained where the relevant injury to the marital partner occurred prior to marriage. Defendants' Memorandum of Law at 64.

Plaintiffs maintain that as summary judgment should not be granted with regard to the underlying claims, the court should also refrain from granting summary judgment on the instant derivative loss of consortium claims. Plaintiffs' Memorandum of Law at 45. Plaintiffs have, however, conceded that Marlene Lamancuso's loss of consortium claim should be dismissed. Plaintiffs' Memorandum of Law at 45.

19. The court notes that loss of consortium claims were originally asserted by Ellen Basinski as spouse of Harry Basinski, Patricia Batt as spouse of Kevin Batt, Morley Davis as spouse of Geraldine Davies, Delores Fiels as spouse of Robert Fiels, Annabel Foisset as spouse of Leo Foisset, Leo Foisset as spouse of Annabel Foisset, Carl Forman as spouse of Nancy Forman, Raymond Freier as spouse of Rose Freier, Rose Freier as spouse of Raymond Freier, Marlene Lamancuso as spouse of Michael Lamancuso, Marie Manolis as

In New York, a loss of consortium claim is derivative in nature as it belongs to the spouse of the party on whose behalf a personal injury or survival action is maintained. *Liff v. Schildkrout,* 49 N.Y.2d 622, 427 N.Y.S.2d 746, 404 N.E.2d 1288, 1291 (1980). Additionally, a spouse may recover on a loss of consortium claim only for the period between injury to and the spouse's death. *Liff, supra,* at 1291.

As the court is recommending dismissal of all the instant actions except Harry Basinski's personal injury claim based on his prostate cancer and Rose Freier's survival action based on her liver and throat cancers, all the loss of consortium claims asserted which are derivative of the claims of Kevin Batt, Geraldine Davies, Annabel Foisset, Leo Foisset, Nancy Forman, Raymond Freier, Michael Lamancuso, Louis Manolis, Donna McKowan and Franklin Mueller must also be DISMISSED. The loss of consortium claims continue as to Harry Basinski, provided an appropriate person in substituted for Ellen Basinski who is now deceased, and Rose Freier.

Further, should the district court disagree that the underlying claims from which the loss of consortium claims are derived should be dismissed as untimely, Marlene Lamancuso's loss of consortium claim should be dismissed in accordance with Plaintiffs' concession.

### 5. *Punitive Damages*

As stated, the instant Plaintiffs have filed personal injury, survival and wrongful death actions, as well as claims for loss of

spouse of Louis Manolis, Donald McKowan as spouse of Donna McKowan, Flora Mueller as spouse of Franklin Mueller, and Patricia Wagner as spouse of Norman Wagner. Delores Fiels and Patricia Wagner have, however, discontinued their claims. See Decision and Order, dated August 31, 1998 (Docket Item Number 504) at 27–28. Additionally, Ellen Basinski has died since commencing her action and a representative of her estate has yet to be substituted.

consortium. Defendants contend that under New York law, punitive damages are recoverable only if the underlying cause of action supports such an award. Specifically, Defendants argue that if the underlying survival and wrongful death actions are time-barred, no underlying cause of action remains to support an award of punitive damages. Defendants' Memorandum of Law, at 65 (citing Defendants' *Pfohl I* Memorandum of Law at 46–49). Defendants also maintain that the Plaintiffs' punitive damages claims are legally insufficient as punitive damages are not available unless the defendant acted with wrongful intent and with a degree of recklessness similar to criminality. *Id., citing Astor* Complaint (Docket Item Number 1, 95–CV–247E(F)) at ¶ 71. Defendants therefore urge that Plaintiffs' allegations that Defendants' actions "were grossly, recklessly and wantonly negligent and were done with utter disregard for the rights and safety of plaintiffs and other persons similarly situated" should be dismissed. *Id.*

 Punitive damages may be awarded in tort actions brought under New York law "where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him, as well as others who might be so prompted, from indulging in similar conduct in the future." *Walker v. Sheldon,* 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497, 498 (1961). In 1982, the New York survival statutes, N.Y. Est. Powers & Trusts Law §§ 5–4.3(b) and 11–3.2(b)(McKinney 1997), were amended to permit punitive damages in survival and wrongful death actions as to any decedent whose death occurred after August 31, 1982. *See* 1982 N.Y. Laws 100, §§ 1 and 2. However, no separate cause of action for punitive damages exists under New York law and, accordingly, punitive damages

may be recovered only if such damages are available upon establishing the underlying claim. *Porter v. Allstate Insurance Co.,* 184 A.D.2d 685, 585 N.Y.S.2d 465, 466 (App.Div.2d Dep't.1992).

In the instant case, the court has determined that all of the actions are untimely except for the claims pertaining to Harry Basinski's prostate cancer and Rose Freier's liver and throat cancer. Discussion, *supra,* at 250–51. Additionally, the loss of consortium claims derivative of Harry Basinski's and Rose Freier's claims are also timely. *Id.* Accordingly, the claims for punitive damages may proceed only as to those claims and the balance should be dismissed.[20]

## CONCLUSION

Based on the foregoing, Defendants' motion for partial summary judgment should be DENIED as to Harry Basinski (based on his prostate cancer), Ellen Basinski (based on her loss of consortium claim asserted with respect to Harry Basinski's personal injury claim limited to his prostate cancer), Raymond Freier (based on his loss of consortium claim asserted with respect to Rose Freier's personal injury claims limited to her liver and throat cancers) and Rose Freier (based on her personal injury and failure to warn claims limited to her liver and throat cancers) and GRANTED as to Grace Astor, Kevin Batt, Patricia Batt, Geraldine Davies, Morley Davies, Robert Fiels, Annabel Foisset, Leo Foisset, Carl Forman, Nancy Forman, Raymond Freier (as to his personal injury and failure to warn claims), Rose Freier (as to her loss of consortium claim relative to Raymond Freier's personal injury claim), Tab Fuqua, Helen Hancock, Marlene Lamancuso, Michael Lamancuso, Louis Manolis, Marie Manolis, Donald McKowan, Donna McKowan, Charlotte Mucha, Flora Mueller, Franklin Mueller,

**20.** The court notes that although Ellen Basinski whose loss of consortium claim was derivative of Harry Basinski's claims has died since her action was commenced, no motion has been made to substitute a representative of her estate to continue her suit.

William Nielsen, Norman Wagner and Mary Ylmar.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiffs and the Defendants.

SO ORDERED.